Mevester LYLES, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 30A01–0406–CR–241.

Court of Appeals of Indiana.

Sept. 29, 2005.

Transfer Denied Dec. 1, 2005.

Randall V. Sorrell, Donald E. Hamilton, O'Neal & Sorrell, Fortville, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Maureen Ann Bartolo, Kelly A. Miklos, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Mevester Lyles appeals his convictions and sentences for class B felony robbery,[1] class B felony burglary,[2] class B felony criminal confinement,[3] as well as his habitual offender[4] finding and sentence. We affirm and remand with instructions.

### Issues

Lyles raises ten issues, which we consolidate and restate as follows:

I. Whether the trial court abused its discretion by admitting evidence seized from Lyles' car during an inventory search;

II. Whether the trial court abused its discretion by admitting evidence of the victim's identification pursuant to a show-up procedure;

III. Whether the trial court abused its discretion by denying Lyles' motion for mistrial predicated upon alleged prosecutorial misconduct;

IV. Whether the trial court abused its discretion by permitting the State to elicit testimony through cross-examination of Lyles' witnesses and the State's rebuttal witness;

V. Whether the trial court abused its discretion by failing to instruct the jury on the definition of "prior unrelated felony" and the State's burden of proof during the habitual offender phase of the trial;

VI. Whether the trial court abused its discretion in failing to find mitigating factors and weighing the aggravating and mitigating factors; and

VII. Whether Lyles waived other claims.

### Facts and Procedural History

On August 18, 2003, at approximately 1:00 p.m., sixty-five-year-old Ron England returned to his McCordsville home in Hancock County and saw a car parked in his driveway that he later described as a maroon Buick or Oldsmobile with left front fender damage. He also noticed that his back door had been "jimmied." Tr. at

1. Ind.Code § 35–42–5–1.

2. Ind.Code § 35–43–2–1.

3. Ind.Code § 35–42–3–3.

4. Ind.Code § 35–50–2–8.

589–91. When he entered his kitchen, he saw Lyles in the hallway only four or five feet away. England asked Lyles what he was doing in his home. Lyles answered that he was a police officer. England asked to see his badge, and Lyles reached behind his back as if to reach for a gun. England then reached for his phone and discovered that it had been torn off the wall. Lyles ordered England to lie down on the floor and went through his pockets. He found England's keys and threw them down the hallway. Lyles retrieved a knife from the counter, jabbed it three or four times into the floor next to England's head, and told England, "I will stab you thirty or forty times if I have to to kill you." *Id.* at 600. Lyles then tied up England with a phone cord.

Lyles left the home through the back door. England then untied himself and ran out the front door to his neighbor's house, where he asked the neighbor to call 9–1–1. The neighbor handed the phone to England, who remained outside. As England described the events leading to the emergency call, he saw the maroon vehicle drive away. England then told the dispatcher that the vehicle was leaving and gave the dispatcher a description of the vehicle. Within minutes, police officers arrived at England's home.

England described the perpetrator to Hancock County Sheriff's Detective Kevin Haggard as a black male, 5′9″ or 5′10″ tall, weighing a little over two hundred pounds, with a shaved head, a thin line mustache, gold chains around his neck, and wearing an orange and black basketball outfit with "CHICAGO" written on it in black. *Id.* at 538–39, 596–97. England also reported that his gun and knife collections were missing. England accompanied Detective Haggard to Lexington Park Apartments in Marion County to identify a vehicle matching England's description. However, England was not sufficiently certain that the

vehicle was the one he had seen in his driveway.

At approximately 2:10 p.m., Hancock County Sheriff's Deputy Robert Campbell and Marion County Sheriff's Corporal Kevin Kendall met at Lexington Park Apartments to investigate a report from the apartment manager that a yellow pillowcase containing guns, knives, and other items had been discovered in a bush near the pool. During his investigation of the grounds, Corporal Kendall noticed Lyles, who matched England's description, walking to a vehicle, which also matched England's description. Lyles drove away from the complex. Corporal Kendall returned to his squad car, began following Lyles' car, and called for backup. When backup arrived, Corporal Kendall activated his emergency equipment to stop the vehicle. Approximately one-half mile from the apartment complex, Lyles stopped his car in the middle of the street. Because Lyles was a felony suspect for a burglary in which guns and knives had been stolen, Corporal Kendall ordered Lyles to exit the vehicle with his hands up, directed him to walk backward to the trunk of his car, and handcuffed him for officer safety. *Id.* at 938.

Corporal Kendall checked the vehicle for other occupants but found no one. Next, he ran a check on Lyles' drivers license and learned that it had been suspended. Pursuant to Marion County Sheriff's Department policy, when a person's license has been suspended, that person's vehicle must be impounded. Accordingly, Corporal Kendall called for a wrecker to tow Lyles' vehicle. The Marion County Sheriff's Department also requires officers who impound a vehicle to inventory all the items in the vehicle because the department is responsible for every item in the vehicle while it is impounded. Pursuant to this policy, Corporal Kendall began an inventory search of the vehicle by inspecting

the passenger compartment of Lyles' vehicle. He then opened the trunk for inspection and found several guns. Knowing that guns had been stolen earlier that day in Hancock County, he immediately contacted the Hancock County Sheriff's Department and stopped the inventory.

In the meantime, Detective Haggard, England, and England's wife and daughter had returned to the apartment complex. There, England identified as his the yellow pillowcase and its contents as well as some coins found in the same vicinity. Immediately thereafter, Detective Haggard and England drove to the location where Corporal Kendall had stopped Lyles so that England could participate in a show-up identification. As they approached the location, Detective Haggard turned down his police radio. Several police cars were present, so Detective Haggard parked some yards behind the last vehicle.

Detective Haggard asked England to remain in his car while he left to discuss the show-up identification procedure with Corporal Kendall. Detective Haggard returned to his car and advised England that a person would be brought to the rear of the police cars. Detective Haggard would then drive closer until England told him to stop, and England should determine whether the person was the one that he saw in his home. Subsequently, two officers escorted Lyles, in handcuffs, to the end of the line of police cars. Detective Haggard pulled forward and stopped his vehicle. England asked him to pull up a little closer until they were approximately twenty-five feet away from Lyles. Without hesitation, England identified Lyles as the man he had seen in his home. The time was 3:33 p.m. Detective Haggard asked England if he was sure. England replied that he was sure and that he would never forget the person who threatened to kill him. He stated that he knew Lyles was the man he had seen at his home, even

though Lyles was not wearing gold chains and had changed his clothes. Detective Haggard radioed his captain so that Lyles' vehicle could be secured and a search warrant obtained. The Hancock County Sheriff's Department took Lyles' vehicle into custody, and Corporal Kendall was unable to complete the inventory.

Search warrants for Lyles' home at Lexington Park Apartments and Lyles' vehicle were obtained, and many of England's possessions were recovered. An athletic shirt and matching shorts almost identical to England's description were found in Lyles' washing machine. In addition, when Detective Haggard arrived at Lyles' apartment to perform the search, he found eleven-year-old L.S., the daughter of Lyles' girlfriend. L.S. told Detective Munden, who was assisting Detective Haggard, that her mother and Lyles had left early that morning and that Lyles had returned home at approximately 1:30 p.m., changed his clothes, and left again.

On August 19, 2003, the State charged Lyles with class B felony robbery, class B felony burglary, and class B criminal confinement. On September 9, 2003, the State charged Lyles with being a habitual offender. On February 26, 2004, a jury found Lyles guilty as charged and found him to be a habitual offender. On April 6, 2004, the trial court sentenced Lyles to concurrent twenty-year terms for his robbery, burglary, and criminal confinement convictions. For the habitual offender finding, Lyles was sentenced to a consecutive fifteen-year term.

Lyles appeals. Additional facts will be provided as necessary.

## Discussion and Decision

### I. *Admissibility of Evidence/Inventory Search*

#### A. *Admissibility of Evidence*

 Lyles contends that the trial court abused its discretion by admitting

evidence seized in an inventory search that he claims was conducted in violation of his right against unreasonable searches and seizures pursuant to the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Initially, we note that

A trial court has broad discretion in ruling on the admissibility of evidence. Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court.

*Washington v. State,* 784 N.E.2d 584, 586–87 (Ind.Ct.App.2003).

### B. Inventory Search

■ The Fourth Amendment to the U.S. Constitution, applicable to the states under the Fourteenth Amendment, requires that searches of private property be reasonable and authorized by a properly issued warrant. *Fair v. State,* 627 N.E.2d 427, 430 (Ind.1993). Searches made without a warrant are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Id.* An inventory search of a lawfully impounded vehicle is one such exception. *Id.* at 431. An inventory search passes constitutional muster when it is reasonable under all the facts and circumstances of the case. *Id.* We evaluate both the propriety of the impoundment and the scope of the inventory for reasonableness. *Id.* To insure that the search is not a pretext "for general rummaging in order to discover incriminating evidence[,]" the State must establish that the search was conducted pursuant to standard police procedures. *Id.* at 435 (quoting *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990)).

■ Here, Lyles concedes that the police legitimately impounded his vehicle because he was driving with a suspended license. He further concedes that an inventory search performed at the location of an arrest or traffic stop may be proper if it follows normal inventory procedures. He claims, however, that Corporal Kendall did not follow the Marion County Sheriff's Department's procedure for conducting an inventory search and that the search was therefore a pretext to conceal the actual police investigatory motive. The Marion County Sheriff's Department inventory procedure requires the following:

*0259 Inventory of Items From Impounded Cars*

.10 Members who impound a vehicle for any reason shall inventory all items in the vehicle that are not regular aprts [sic] or accessories to the vehicle.

.20 The inventory shall be repeated in the Member's report concerning the impounded vehicle and the inventory shall be made a permanent record in the member's notebook.

Tr. at 972; Ex. 66.

Lyles' argument that the search was a pretext relies exclusively on the fact that Corporal Kendall failed to make a written record. He does not set forth, nor does the record reveal, any other improprieties in the manner in which Corporal Kendall conducted the inventory search. Corporal Kendall began the inventory search by inspecting the passenger compartment and then opened the trunk for inspection. Upon observing several guns in the trunk, he suspended the inventory search because it had been reported that England's firearms had been stolen. Corporal Kendall did not want to disturb the evidence because he did not want to "tarnish the investigation." *Id.* at 944. Thus, up to this point, Corporal Kendall's inventory

search was reasonable and complied with department procedures.

The State argues, and we agree, that the inventory search was legitimately suspended when Corporal Kendall discovered the guns and that he was unable to complete the search because the Hancock County Sheriff's Department took custody of the vehicle. Lyles' argument fails to account for the logistical difficulties faced by the police in a situation where a crime was committed in Hancock County and the perpetrator and stolen property were found in Marion County. Under the facts and circumstances of this case, we cannot conclude that the failure to make a written record invalidates an otherwise reasonable search. *See Peete v. State*, 678 N.E.2d 415, 420–21 (Ind.Ct.App.1997) (holding that inventory search was lawful where officer found film canister containing cocaine under front passenger seat and written inventory list was not made because nothing of value was found). Therefore, Lyles' Fourth Amendment rights were not violated.

▇▇ Having concluded that the inventory search did not violate the United States Constitution, we consider Lyles' claim under Article 1, Section 11 of the Indiana Constitution. To determine whether a search violates the Indiana Constitution, we consider the facts of each case to decide whether the police behavior was reasonable. *Brown v. State*, 653 N.E.2d 77, 79 (Ind.1995). Here, there is no dispute that the impoundment of Lyles' vehicle was proper. Furthermore, there is no dispute that Marion County policy requires officers to inventory such vehicles. Corporal Kendall properly began to inventory the vehicle. He knew that guns had been stolen earlier that day in Hancock County, so when he discovered guns in the

trunk, he stopped the inventory and reported the discovery to the Hancock County Sheriff's Department. Hancock County took custody of the vehicle, and therefore, the inventory could not be completed. Under the facts of this case, the inventory search was reasonable even though Corporal Kendall did not make a written record. Accordingly, the trial court did not abuse its discretion by admitting the evidence seized in the inventory search.

## II. Show–Up Procedure

▇▇ Lyles contends that the trial court abused its discretion by admitting evidence from the "show-up" identification conducted at the end of the line of police cars where Corporal Kendall stopped Lyles' vehicle. Specifically, he argues that the show-up identification was conducted in a manner that violated his due process rights under the Fourteenth Amendment of the United States Constitution.[5] "A show-up procedure may be so unnecessarily suggestive and so conducive to irreparable mistake as to constitute a violation of due process of law under the Fourteenth Amendment." *Hubbell v. State*, 754 N.E.2d 884, 892 (Ind.2001) (citing *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). We review such claims by examining the totality of the circumstances surrounding the identification including (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the

---

5. Lyles mistakenly argues that the show-up identification violated his right against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

length of time between the crime and the confrontation. *Adkins v. State,* 703 N.E.2d 182, 186 (Ind.Ct.App.1998). "Identifications of a freshly apprehended suspect have been held to be not unnecessarily suggestive despite the suggestive factors unavoidably involved in such confrontations because of the value of the witness's observation of the suspect while the image of the offender is fresh in his mind." *Lewis v. State,* 554 N.E.2d 1133, 1135 (Ind.1990).

We acknowledge that the show-up identification in this case raises some concerns. Lyles, the only African–American, was presented for identification in handcuffs standing between two police officers at the end of a line of police cars. However, Indiana courts have held that similar show-up identifications were not unduly suggestive. In *Gray v. State,* 563 N.E.2d 108 (Ind.1990), our supreme court upheld a show-up identification in which the defendant was the only African–American person at the scene not wearing a police uniform, was in handcuffs, and was identified at a location different from where the robbery occurred. *Id.* at 109–10. The *Gray* court noted that the witnesses gave an accurate and detailed description of the suspect, and the show-up identification occurred within fifteen to thirty minutes of the robbery. *Id.* at 110. Likewise, in *Adkins,* this court upheld a show-up identification in which the defendant was the only person present who was not a police officer, was in handcuffs, and stood next to a police car. 703 N.E.2d at 185. In determining that the show-up in *Adkins* was not a violation of due process, we noted that the witness had accurately described the suspect and had unequivocally identified the suspect within forty minutes of the crime. *Id.; but see Wethington v. State,* 560 N.E.2d 496, 502 (Ind.1990) (holding that show-up identifications at roadside stop and fire station conducted two and three hours, respectively, after commission of crime were unduly suggestive where suspects were paraded before witnesses, many law enforcement officials were present, and physical evidence of crime was prominently displayed).

■ Our examination of the totality of the circumstances surrounding this identification convinces us that the show-up was not unduly suggestive. England encountered Lyles in the middle of the day and stood no more than five feet from him. The two men had a short conversation and were in the presence of each other for several minutes. Thus, England had a sufficient opportunity to observe Lyles' face and clothing. England provided officers with a fairly accurate description of Lyles as well as clothing found in Lyles' washing machine. Finally, England's identification was unequivocal, demonstrating a high level of certainty.

■ Lyles stresses that the show-up procedure took place approximately two and one-half hours after the crimes. However, Lyles cites no authority suggesting that a show-up occurring in this time frame is per se impermissible. On the contrary, we have stated that it is "permissible for a law enforcement officer to present a suspect for identification within a few hours of the commission of the crime." *Lewis,* 554 N.E.2d at 1135; *see also Glover v. State,* 441 N.E.2d 1360, 1363 (Ind.1982). In fact, the time period between the crime and the show-up is merely one factor to consider in determining whether a show-up is unduly suggestive. *See Adkins,* 703 N.E.2d at 186. Based on the totality of the circumstances present here, the time period between the crime and the show-up is not so long as to invalidate the identification. We conclude that the trial court did not abuse its discretion by admitting evidence from the show-up identification.

### III. Motion for Mistrial/Prosecutorial Misconduct

In his closing arguments at trial, Lyles' counsel referred the jury to a videotape of Lyles' police interview in which Lyles denied any involvement in the crime:

> So we've got the videotape. In that videotape, there's a tremendous amount of pressure being asserted against Mr. Lyles.... In face of all of that what sounds like a—open and shut case why wouldn't the guy admit it at that point. He says from the very beginning of that interview, I did not do this. I was not in that man's house.... Right from the very beginning to the very end. And there's something that's very important in that videotape.

Tr. at 1084–85. The prosecutor stated in his closing rebuttal argument, "This is what we're being handed here folks. We're being handed a story. And I hope you saw on the videotape—was Mr. Lyles sworn under oath like each and every witness?" *Id.* at 1091. Defense counsel objected and moved for mistrial on the grounds that the prosecutor had commented on Lyles' decision not to take the stand. The trial court denied the motion.

 On appeal, Lyles asserts that the trial court abused its discretion by denying his motion for mistrial.

> A mistrial is an extreme remedy warranted only when no other curative measure will rectify the situation. The determination of whether to grant a mistrial is within the trial court's discretion, and we will reverse only for an abuse of that discretion. An abuse of discretion has occurred if the trial

court's decision is clearly against the logic and effect of the facts and circumstances before the trial court. We accord great deference to the trial court's decision, as it is in the best position to gauge the circumstances and the probable impact on the jury.

*Kirby v. State,* 774 N.E.2d 523, 533–34 (Ind.Ct.App.2002) (citations omitted), *trans. denied.* Specifically, Lyles argues that the prosecutor commented on his failure to take the stand and thereby violated his Fifth Amendment right against self-incrimination.[6] When reviewing a claim of prosecutorial misconduct, we first determine whether misconduct occurred, and if so, whether it had a probable persuasive effect on the jury. *Ritchie v. State,* 809 N.E.2d 258, 268–69 (Ind.2004). "Although often phrased in terms of 'grave peril,' a claim of improper argument to the jury 'is measured by the probable persuasive effect of any misconduct on the jury's decision and whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant.'" *Id.* at 269 (quoting *Brown v. State,* 799 N.E.2d 1064, 1066 n. 1 (Ind. 2003)).

 In general, when a prosecutor makes a comment that the jury could reasonably interpret as an invitation to draw an adverse inference from the defendant's decision not to testify, the defendant's Fifth Amendment privilege against self-incrimination is violated. *Haycraft v. State,* 760 N.E.2d 203, 208 (Ind.Ct.App. 2001), *trans. denied.* However, we will not reverse if the prosecutor's comment, in its

---

6. We reject the State's argument that because Lyles failed to request an admonishment in addition to a mistrial he necessarily waived appellate review of this issue. *See Kirby,* 774 N.E.2d at 534 n. 5 ("Because Kirby made a motion seeking a remedy, albeit a drastic one [i.e., mistrial], we decline to decide this case on the basis of waiver, and turn instead to the merits."); *see also Holsinger v. State,* 750 N.E.2d 354, 365–66 (Ind.2001) (stating that a motion for admonishment may be dispensed with where it is obvious, from the nature and degree of misconduct, that no admonishment could suffice).

totality, focuses on evidence other than the defendant's failure to testify. *Id.* "Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Dumas v. State,* 803 N.E.2d 1113, 1118 (Ind.2004).

 We disagree with Lyles' contention that the prosecutor's statement was a comment on Lyles' decision not to take the stand. Rather, the prosecutor's statement was made in response to defense counsel's closing argument, which invited the jury to confer substantial weight to Lyles' videotaped denial by suggesting that his denial was made despite repeated police assertions that there was substantial evidence of Lyles' guilt. The prosecutor responded to that specific argument by suggesting to the jury that the videotaped statement did not deserve the same weight and credibility as the testimony of the State's sworn witnesses. As such, the prosecutor's statement was not a comment on Lyles' decision not to testify and does not constitute prosecutorial misconduct. Accordingly, we conclude that the trial court did not abuse its discretion by denying Lyles' motion for mistrial.

### IV. State's Cross–Examination and Rebuttal

 Lyles argues that the trial court abused its discretion by permitting the State to ask L.S., the eleven-year-old daughter of Lyles' girlfriend, questions that went outside the scope of his direct examination of L.S. Lyles makes a similar argument with regard to the State's questions of Detective Munden during its rebuttal. Initially, we note our standard of review:

> The trial court is vested with broad discretion in determining the scope and extent of cross-examination.... The scope of permissible cross-examination extends to all phases of the subject matter covered in direct examination and may include any matter which tends to elucidate, modify, explain, contradict, or rebut testimony given in chief by the witness. Further, once a party opens up a subject on direct examination, he can not close the subject to cross-examination at his own convenience.

*Smith v. State,* 765 N.E.2d 578, 588 (Ind. 2002) (citations and quotation marks omitted). Indiana Evidence Rule 611 states, "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

Here, Lyles' counsel called L.S. as a witness to provide an alibi defense. On direct, Lyles' counsel questioned L.S. as to when Lyles was in the apartment and when he left on the day the crime was committed. L.S. testified that Lyles returned home at approximately 12:00 p.m. and remained home until approximately 2:00 p.m. L.S. also testified that during that time someone knocked on the door twice and that Lyles answered the door. She stated that she overheard men's voices but did not know whether either caller came inside the apartment.

On cross-examination, the State questioned L.S. regarding whether she remembered telling law enforcement officers that she had seen Lyles only once that day at approximately 1:30 p.m. Lyles objected that the question was outside the scope of direct examination, but the trial court overruled the objection. During rebuttal, the State questioned Detective Munden whether he was absolutely sure that L.S. had told him that Lyles had not been in the apartment except for briefly returning at 1:30 p.m. Lyles' counsel objected several times that the State's questions were

improper for rebuttal, but the trial court overruled his objections.

▆▆▆ We conclude that during its cross-examination of L.S. and rebuttal, the State simply asked questions to demonstrate that L.S.'s testimony was not consistent with the statement that she gave to Detective Munden on the day of the crime. As such, the State's questions were directed to the subject matter of the direct examination as well as matters affecting the credibility of the witness. *See* Ind. Evidence Rule 611. Therefore, the trial court did not abuse its discretion by allowing the State to conduct its cross-examination and rebuttal as it did.

### V. Jury Instructions

Lyles contends that the trial court abused its discretion by failing to provide the jury with preliminary instructions that explained the State's burden of proof and defined "prior unrelated felony convictions" during the habitual offender phase of the trial.[7] The "Habitual Offender Statute" provides in relevant part:

(a) Except as otherwise provided in this section, the state may seek to have a person sentenced as a habitual offender for any felony by alleging, on a page separate from the rest of the charging instrument, that the person has accumulated two (2) prior unrelated felony convictions.

. . . .

(c) A person has accumulated two (2) prior unrelated felony convictions for purposes of this section only if:

(1) the second prior unrelated felony conviction was committed after sentencing for the first prior unrelated felony conviction; and

(2) the offense for which the state seeks to have the person sentenced as

a habitual offender was committed after sentencing for the second prior unrelated felony conviction.

. . . .

(g) A person is a habitual offender if the jury (if the hearing is by jury) or the court (if the hearing is to the court alone) finds that the state has proved beyond a reasonable doubt that the person had accumulated two (2) prior unrelated felony convictions.

Ind.Code § 35–50–2–8.

▆▆▆ We consider jury instructions "as a whole and in reference to each other" and do not reverse the trial court "for an abuse of that discretion unless the instructions as a whole mislead the jury as to the law in the case." *Helsley v. State,* 809 N.E.2d 292, 303 (Ind.2004) (quoting *Carter v. State,* 766 N.E.2d 377, 382 (Ind.2002)). "An error in a particular instruction results in reversal only where the entire body of instructions misleads the jury as to the law in the case." *Id.*

▆▆▆ Here, contrary to Lyles' assertion that the trial court failed to instruct the jury as to the State's burden of proof, the record reveals that the preliminary instructions included the following:

The State has the burden of proving the defendant is a habitual offender beyond a reasonable doubt. Some of you may have served as jurors in a civil case where you were told that it is only necessary to prove the fact is more likely true than not true. It must be beyond a reasonable doubt.

Tr. at 1137. We conclude that the trial court properly instructed the jury as to the State's burden of proof.

Turning to Lyles' contention that the trial court failed to instruct the jury on the

---

7. Lyles argues that the trial court committed fundamental error but notes that defense counsel made a timely objection to the in-

structions. Tr. at 1132. Thus, we review this claim using an abuse of discretion standard.

proper definition of "prior unrelated felony convictions" in its preliminary instructions, we note that he fails to acknowledge that the final jury instructions contained a proper definition. *Id.* at 1224–25. Lyles cites no authority to support his contention that the failure to provide the definition of "prior unrelated felony convictions" in a preliminary instruction when it was included in the final instructions is an abuse of discretion, let alone reversible error.[8] Nor does he articulate how such a failure would mislead the jury. Furthermore, the record reveals that the trial court included the Habitual Offender Statute in both its preliminary and final instructions to the jury. *Id.* at 1134–35, 1223. We conclude that the trial court's instructions, taken as a whole, properly instructed the jury on the State's burden of proof and the definition of "prior unrelated felony convictions."

## VI. Aggravating and Mitigating Factors

Lyles contends that the trial court failed to find mitigating factors and to properly weigh the aggravating and mitigating factors in sentencing him for robbery, burglary, and criminal confinement. Lyles received a twenty-year sentence for each conviction, to be served concurrently.[9] In sentencing Lyles, the trial court stated,

The court finds the following aggravating factors, 1) the Defendant was on parole at the time of the crime; 2) the Defendant has a lengthy criminal history; 3) the victim of the crime was a person over 65 years of age. The Court does not find any mitigating circumstances. The Court finds that the aggravating factors outweigh the mitigating factors.

Tr. at 1275.

Sentencing determinations are within the discretion of the trial court. *Ruiz v. State*, 818 N.E.2d 927, 928 (Ind. 2004). If a trial court relies on aggravating or mitigating circumstances to modify the presumptive sentence, it must: (1) identify all significant aggravating and mitigating circumstances; (2) explain why each circumstance is aggravating or mitigating; and (3) articulate the evaluation and balancing of the circumstances. *Id.*

Lyles complains that the presentence investigation report ("PSI") did not list any mitigating factors. However, Lyles does not identify, nor does the record establish, any mitigating circumstances. Lyles also complains that the PSI inappropriately listed as an aggravator that reducing Lyles' sentence would depreciate the seriousness of the crimes. However, the trial judge did not include that particular factor as an aggravating circumstance. Lyles also contends that he raised the issue that more than half the items in the PSI criminal history section included charges that were dismissed by the court, were never filed, or were pending, but fails to cite the appropriate page of the record to support his assertion. In any event, the record reveals that Lyles admitted to five previous felony convic-

---

8. Lyles' reliance on *Rainey v. State*, 557 N.E.2d 1071 (Ind.Ct.App.1990), is misplaced. He apparently interprets that case as standing for the proposition that the trial court must instruct the jury as follows: "In order to be unrelated prior felonies, as that term is used in the habitual offender statute, the following sequence of events must occur: the person must commit, be convicted of and be sentenced for felony No. One; he must then commit, be convicted of and be sentenced for felony No. Two." *Id.* at 1076. While we concluded that this instruction was proper, we did not hold that it was required in all habitual offender proceedings. *Id.*

9. Indiana Code Section 35–50–2–5 (2004) provides that the sentence for a class B felony is ten years, to which ten years may be added for aggravating circumstances and four years may be deducted for mitigating circumstances.

tions. Tr. at 1269. We conclude that the trial court did not abuse its discretion in sentencing Lyles.

## VII. Waiver of Remaining Issues

### A. Local Discovery Rules

■■■ Lyles argues that Hancock County Local Rule 12(G), which requires that trial courts pre-approve expenditures before attorneys for indigent defendants take depositions, violated his due process and equal protection rights under the United States and Indiana Constitutions. Lyles has waived this issue on two grounds. First, Lyles failed to make an objection to the trial court. A failure to object at trial results in waiver of the issue on appeal. *See, e.g., Miller v. State,* 753 N.E.2d 1284, 1287 (Ind.2001).

■■■ In addition, Lyles fails to develop an argument or support it with citations to authority. His argument section merely sets forth the rules governing the taking of depositions, cites authority supporting the proposition that indigents have a right, albeit a limited one, to depose witnesses at public expense, and makes a bald assertion that such limitations violate his constitutional rights. Lyles fails to explain how his constitutional rights were violated, nor does he cite any portion of the record that indicates the manner in which his rights were violated. Indiana Appellate Rule 46(A)(8) provides in relevant part, "The argument must contain the contentions of the appellant on the issues presented supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on." A party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record. *Smith v. State,* 822 N.E.2d 193, 202–03 (Ind.Ct.App.2005), *trans. denied.* Accordingly, Lyles has waived this issue.

### B. State's Failure to Provide a Witness List

■■■ Lyles contends that the State did not comply with local discovery rules in that it failed to provide a witness list sufficiently in advance of trial and that such failure violated his rights to due process and confrontation under the United States and Indiana Constitutions. Lyles' discussion focuses almost exclusively on the facts relating to discovery and fails to articulate how his constitutional rights were violated. Lyles has waived this contention by failing to make a cogent argument with citations to supporting authority. *See id.; see also* Ind. Appellate Rule 46(A)(8).

### C. Habitual Offender Enhancement

■■■ Lyles also alleges that his habitual offender enhancement is manifestly unreasonable. Effective January 1, 2003, Indiana Appellate Rule 7(B) no longer contains the phrase "manifestly unreasonable." It now provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is *inappropriate* in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B) (emphasis added). Even though Lyles labels the issue as a manifestly unreasonable sentence, he makes no argument to that effect. Rather, he claims that the trial court failed to find mitigating factors, but then fails to identify any that it should have found. Therefore, Lyles has waived this claim. *See Smith,* 822 N.E.2d at 202–03; *see also* Ind. Appellate Rule 46(A)(8)(a).

### D. Right to an Impartial Jury

■■■ Lyles claims that Hancock County engages in systematic racial exclusion such that he was denied the right to an impartial jury guaranteed by the United States and Indiana Constitutions.

Lyles waived this claim by failing to object to the racial composition of the jury or the jury selection process. *See Miller,* 753 N.E.2d at 1287. Additionally, Lyles agreed to the selected jurors. A defendant cannot invite error and then request relief on appeal based upon that ground. *Mitchell v. State,* 730 N.E.2d 197, 201 (Ind. Ct.App.2000), *trans. denied.* Finally, Lyles waives this issue by failing to provide a cogent argument. *See Smith,* 822 N.E.2d at 202–03; *see also* Ind. Appellate Rule 46(A)(8). He baldly asserts that minorities are under-represented in the jury pool but provides no basis for that assertion. In his reply brief, he concedes as much. Appellant's Reply Br. at 15. We simply cannot review his claim without the assistance of an adequate record. *See, e.g., Lee v. State,* 694 N.E.2d 719, 721, n. 6 (Ind.1998) ("[I]t is defendant's duty to present this Court with an adequate record on appeal and when defendant fails to do so, the issue is deemed waived.").

### Conclusion

We conclude that the inventory search of Lyles' vehicle was reasonable, and therefore, the trial court did not abuse its discretion in admitting evidence seized therefrom. Nor did the trial court abuse its discretion by admitting evidence pursuant to the show-up identification. There was no prosecutorial misconduct, so the trial court did not abuse its discretion in denying Lyles' motion for mistrial. In addition, the trial court did not abuse its discretion in determining the scope of the State's cross-examination and rebuttal. The trial court's jury instructions, taken as a whole, were proper. In sentencing Lyles, the trial court did not abuse its discretion in finding no mitigating factors or in balancing the aggravating factors and mitigating factors. Lyles waived all remaining issues.

As a final matter, the State correctly notes that the trial court did not identify the underlying felony conviction to which Lyles' habitual offender enhancement attached. In fact, the trial court improperly ordered a separate sentence for the habitual offender finding. Tr. at 1275. The habitual offender finding is not a separate crime for which a consecutive sentence is imposed. *Wilburn v. State,* 442 N.E.2d 1098, 1100 (Ind.1982). The Habitual Offender Statute "provides for an enhancement of the sentence for the underlying felony of which the defendant must be convicted in order to invoke operation of the statute." *Id.* In this case, the proper procedure would be for the trial court to identify the underlying felony conviction, enhance the sentence for that conviction based on the habitual offender finding, and order the enhanced sentence to run concurrently with the other two sentences. In other words, the habitual offender enhancement of fifteen years should be added to one of Lyles' twenty-year sentences, creating a thirty-five year sentence to be served concurrently with the other two twenty-year sentences. Therefore, we remand so that the trial court may identify the underlying felony conviction for the habitual offender finding and correct the sentencing order as directed.

Affirmed and remanded with instructions.

DARDEN, J., and MATHIAS, J., concur.