**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**SUZY ST. JOHN**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| COREY WEAVER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  49A02-1402-CR-112 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Christina Klineman, Commissioner
Cause No. 49F10-1302-CM-7738

**November 13, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

Appellant/Defendant, Corey Weaver ("Weaver"), appeals his convictions for two counts of Class A misdemeanor resisting law enforcement.[1] He argues that the trial court improperly instructed the jury concerning "force," an essential element of resisting law enforcement. Because Weaver's proposed jury instruction did not properly state the elements of resisting law enforcement and the trial court's Final Jury Instructions sufficiently instructed the jury concerning "force", we conclude that the trial court properly instructed the jury.

We affirm.

## ISSUE

Whether the trial court properly instructed the jury on the elements of Class A misdemeanor resisting law enforcement.

## FACTS

An officer from the Indianapolis Animal Care and Control Division of the Department of Public Safety ("Animal Control") obtained an administrative search warrant to enter Weaver's residence and impound his dogs based on a report that one of Weaver's dogs had attacked his neighbor's dog. On the morning of February 2, 2013, two officers from Animal Control and three officers from the Indianapolis Metropolitan Police Department went to Weaver's house to serve the warrant and to take the dogs. The police officers were present to "escort" the Animal Control officers "for the purpose

---

[1] IND. CODE § 35-44.1-3-1(a)(1) (2013). We note that, effective July 1, 2014, a new version of the resisting law enforcement statute was enacted, but the language of I.C. § 35-44.1-3-1(a)(1) has not changed.

of preserving the peace and assisting in making forced entry, if necessary." (State's Ex. 1, 3).

When the officers arrived at Weaver's residence, they first attempted to question the neighbors to verify Weaver's identity and to ask if any of the neighbors had Weaver's phone number or key to his house. Ultimately, they were unable to get any information from the neighbors. Instead, they verified Weaver's identity by checking his mail in the mailbox and by running the license plate number on the vehicle in the driveway. When they ran the plates, they discovered that Weaver had a lifetime handgun permit. One of the officers, Lieutenant Craig Blanton ("Lieutenant Blanton"), later testified that this caused his alert level to go up. Officer Nikolas Layton ("Officer Layton") agreed that his alert level went up but stated that "somebody having a gun permit is like somebody having a driver's license in Indiana more or less. So, you know, you're a little on your toes; but it's nothing out of the ordinary for us to run across gun permits." (Tr. 204).

After verifying Weaver's identity, the officers knocked on his front door and announced their presence for "maybe a couple of minutes" but did not get a response. (Tr. 96). Lieutenant Blanton returned to his police vehicle, turned on the vehicle's light bar, and "chirped" his siren, which he described as a "loud, abrasive noise." (Tr. 124). He also made an announcement informing Weaver that the police were there and requesting him to come outside so that they could speak with him. Weaver did not respond, even though the announcement was "pretty loud" according to Lieutenant Blanton, and Lieutenant Blanton "chirped" his siren for four to six minutes. (Tr. 124-25).

3

Next, Lieutenant Blanton attempted to knock on the door of the residence again. When he did not receive a response, he began knocking with a metal baton, which was "very loud." (Tr. 126). Because the door was also metal, Lieutenant Blanton knew that the baton would resonate throughout the house. He continued this knocking for approximately two minutes. He also attempted to breach the door using his shoulder but was unsuccessful.

When these efforts failed, the officers retrieved a Halligan tool to attempt to pry open the door. Lieutenant Blanton used the tool twice and was able to open the door approximately a quarter of an inch off of the door frame. He noticed, though, that "as soon as the door would open the slightest bit, it would immediately push back against the door frame." (Tr. 128). This led him to believe that something or someone was exerting pressure on the door. As a result, he started using the tool to bang on the front door, which created a "thump" sound on the other side of the door. (Tr. 128). That sound also led him to believe that "something or someone was on the other side of the door preventing it from being opened." (Tr. 128-29).

On Lieutenant Blanton's third attempt to open the door with the Halligan tool, he heard a "muffled" male voice on the other side of the door telling him to indicate who he was and what he wanted. (Tr. 129). Lieutenant Blanton identified himself as working for the Police Department and said that he had a warrant to check on the dogs. He again asked the person, whom he later identified as Weaver, to open the door so that the officers could speak with him. He also held up the search warrant to a window by the door so that Weaver could read it. When the officers did not get a response, they again

4

attempted to open the door, and Weaver again asked who they were and what they wanted. The officers repeated their announcements, and these events repeated back and forth for the next four to six minutes. Finally, on Lieutenant Blanton's third additional attempt to open the door, Weaver unlocked the dead bolt and opened it.

When Weaver opened the door, the officers saw that Weaver was wearing a "puffy coat" and had his hands in his coat pockets. (Tr. 132). He told them that he would not leave his residence. The officers then asked Weaver to remove his hands from his pockets, and he did so as Lieutenant Blanton grabbed his wrist. However, he kept attempting to put his hands back in his pockets, and the officers were concerned that he was reaching for a weapon. Lieutenant Blanton informed him that he needed to remove his hands because they needed to pat him down to see if he had any weapons. At that point, Weaver "aggressively pulled back trying to free his wrist and hands" and trying to retreat back into his residence. (Tr. 134). He got his wrist free from Lieutenant Blanton, but Officer Layton grabbed his other wrist, and the officers attempted to pull him outside onto the porch so that they could handcuff him. They told him to put his hands behind his back and to stop "resisting," but he did not comply. (Tr. 136). They then told him to get on his knees so that they could control him better, but he refused to do so. As a result, Officer Layton knocked Weaver's feet out from underneath him and brought him to the floor of the porch.

On the floor, Weaver managed to break both officers' grips on him and "clinch[ed]" both of his hands underneath his torso. (Tr. 137). The officers told Weaver to pull his hands out from under his torso, but he refused to do so. Consequently, Officer

5

Layton attempted a knee strike to Weaver's right thigh. Weaver still refused to give the officers his hands, and Officer Layton attempted another knee strike. Weaver turned over and, as a result, this second strike hit him in the face. Weaver still refused to comply with the officers' orders, so Officer Layton attempted another knee strike. At that point, Weaver cooperated and allowed the officers to secure his hands in handcuffs. Subsequently, the Animal Control officers found Weaver's dogs secured in his bathroom.

On February 3, 2013, the State charged Weaver with two counts of Class A misdemeanor resisting law enforcement and one count of Class B misdemeanor disorderly conduct, although it later dismissed the disorderly conduct charge. The trial court held a jury trial on January 27, 2014. At the conclusion of the evidence, Weaver tendered two proposed instructions regarding the elements of resisting law enforcement. Weaver's proposed instruction number six provided that:

> To convict the defendant of Resisting Law Enforcement, the State must have proved each of the following elements:
>
> The Defendant
>
> 1. forcibly
>
> 2. resisted, obstructed, or interfered with a law enforcement officer
>
> 3. while the law enforcement officer was lawfully engaged in the execution of his duties as a law enforcement officer.
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you should find the defendant not guilty.

(App. 71). Weaver argued that placing "forcibly" in a separate line in his proposed instruction number six was necessary to instruct the jury that "forcibly" modified the

6

three verbs "resisted," "obstructed," and "interfered." His proposed instruction number seven provided that: "Forcibly resist means to use strong[,] powerful[,] or violent means." (App. 72).

The trial court denied both of these proposed jury instructions and instead issued Final Jury Instruction Number One, which provided:

The crime of Resisting Law Enforcement is defined by statute as follows:

A person who knowingly or intentionally forcibly resist[s], obstructs, or interferes with a law enforcement officer while the officer is lawfully engaged in the execution of his or her duties as an officer commits Resisting Law Enforcement, a Class A misdemeanor.

To convict the Defendant, as charged in Count I, the State must prove each of the following elements beyond a reasonable doubt:

The Defendant, Cor[e]y Weaver

1. did knowingly

2. forcibly resist, obstruct, or interfere with Ni[k]olas Layton, a law enforcement officer,

3. while the officer was lawfully engaged in the execution of his duties as a law enforcement officer with the Indianapolis Metropolitan Police Department.

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of Resisting Law Enforcement, a class A misdemeanor as charged in Count I.

(App. 112).[2] The trial court's Final Jury Instruction Number Four provided that "[f]orcibly resist means to use strong[,] powerful[,] or violent means to evade a law enforcement official's rightful exercise of his or her duties." (App. 115).

---

[2] Final Jury Instruction Number Two repeated the same language verbatim, except concerning Lieutenant Blanton instead of Officer Layton.

7

The jury found Weaver guilty of both charges of Class A misdemeanor resisting law enforcement. That same day, the trial court sentenced Weaver to 365 days for each of his convictions, with 359 days suspended for each and the sentences to run concurrently. Weaver now appeals.

## DECISION

On appeal, Weaver argues that the trial court abused its discretion by refusing his tendered proposed jury instruction number six. He argues that this instruction emphasized that "forcibly" modifies all three of the verbs that are elements of the offense—"resist," "obstruct," and "interfere." *See* I.C. § 35-44.1-3-1(a) (2013). In other words, the jury was required to find that he "forcibly resisted," "forcibly obstructed," or "forcibly interfered" with a law enforcement officer. (*See* Weaver's Br. 12). He contends that, in contrast, because the trial court instructed the jury to determine whether he "forcibly resist[ed], obstruct[ed], or interfere[d]" with a law enforcement officer, the trial court misled the jury into believing that forcibly only modified the verb "resist." Ind. Code § 35-44.1-3-1(a)(1).

The purpose of a jury instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly so that it arrives at a just, fair, and correct verdict. *Walls v. State*, 993 N.E.2d 262, 269 (Ind. Ct. App. 2013), *trans. denied.* In instructing a jury, the trial court has a statutory duty to state to the jury all matters of law that are necessary for its information in giving its verdict. *Snell v. State*, 866 N.E.2d 392, 396 (Ind. Ct. App. 2007).

8

Because a trial court has broad discretion in instructing a jury, we review a trial court's decision to give or refuse a tendered jury instruction for an abuse of discretion. *Inman v. State*, 4 N.E.3d 190, 201 (Ind. 2014). We undertake a three-part analysis in determining whether a trial court has abused its discretion. *Washington v. State*, 997 N.E.2d 342, 345 (Ind. 2013). First, we determine whether the tendered instruction is a correct statement of the law. *Id.* Second, we examine the record to determine whether there was evidence present to support the tendered instruction. *Id.* at 345-46. And, third, we determine whether the substance of the tendered instruction was covered by another instruction or instructions. *Id.* at 346. We "consider jury instructions as a whole and in reference to each other . . . ." *Patterson v. State*, 11 N.E.3d 1036, 1040 (Ind. Ct. App. 2014) (quoting *Lyles v. State*, 834 N.E.2d 1035, 1048 (Ind. Ct. App. 2005) (internal quotes and citations omitted), *trans. denied*). We will not reverse unless the instructions, taken as a whole, misstate the law or mislead the jury. *Helsley v. State*, 809 N.E.2d 292, 303 (Ind. 2004).

Under the Indiana Code, a person commits resisting law enforcement as a Class A misdemeanor if that person "knowingly or intentionally: (1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties." I.C. § 35-44.1-3-1(a). "Forcibly" is a required element of the crime, and as Weaver notes, our Supreme Court has held that it modifies all three verbs that follow it—resists, obstructs, and interferes. *Spangler v. State*, 607 N.E.2d 720, 723 (Ind. 1993). In *Spangler*, the Court noted that the word "'[f]orcibly' is a word descriptive of the type of resistance, obstruction, or

9

interference proscribed by law," and "[r]esistance, obstruction, or interference with force is the action the statute addresses." *Id.*

Based on this precedent, Weaver's tendered jury instruction correctly described the element of force. However, as the State notes, Weaver's instruction omitted the *mens rea* element of the offense and would not have instructed the jury that the defendant must act "knowingly or intentionally" to commit resisting law enforcement. *See* I.C. § 35-44.1-3-1(a). Accordingly, we conclude that as a whole, the instruction was not a correct statement of the law, and the trial court did not abuse its discretion in denying it.

Furthermore, the substance of Weaver's instruction was covered by the trial court's Final Jury Instructions One and Two. Although the trial court did not separate "forcibly" onto a separate line, the phrase "forcibly resists, obstructs, or interferes" is grammatically equivalent to "forcibly resists, forcibly obstructs, or forcibly interferes." The *Spangler* Court noted, "'the use of the adverb "forcibly" before the first of the string of verbs, with the disjunctive conjunction used only between the last two of them, shows *quite plainly* that the adverb is to be interpreted as modifying them all.'" *Spangler*, 607 N.E.2d at 723 (quoting *White v. State*, 545 N.E.2d 1124, 1125 (Ind. Ct. App. 1989)) (emphasis added). As the Court commented, the grammatical structure of the phrase is clear. A trial court does not need to distinguish "forcibly" to emphasize that it applies to all three verbs. Further, we note that the phrase "forcibly resists, obstructs, or interferes" is a direct quote from the statute governing resisting law enforcement. *See* I.C. § 35-44.1-3-1(a). The use of a phrase with a clear grammatical structure that is a direct quote

from our statutory authority would not have misled a jury. Accordingly, the trial court did not abuse its discretion in instructing the jury.

Affirmed.

NAJAM, J., and BAILEY, J., concur.