## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 16 2020, 8:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Justin R. Wall
Wall Legal Services
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Daniel Miller,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

September 16, 2020

Court of Appeals Case No.
19A-CR-2895

Appeal from the
Wells Circuit Court

The Honorable
Kenton W. Kiracofe, Judge

Trial Court Cause No.
90C01-1809-F3-5

**Vaidik, Judge.**

# Case Summary

Daniel Miller was convicted of Level 3 felony domestic battery resulting in serious bodily injury to a person less than fourteen years old, Level 3 felony neglect of a dependent resulting in a serious bodily injury, Level 6 felony intimidation, and Level 5 felony battery resulting in bodily injury to a person less than fourteen years of age. He appeals the domestic-battery, neglect, and battery convictions, challenging the sufficiency of the evidence. He also appeals his eighteen-year sentence, asserting that it is inappropriate given the nature of the offenses and his character. We affirm.

# Facts and Procedural History

Austin and Courtney Burkholder had two children together, H.B., born in June 2012, and R.B., born in March 2018. Shortly after R.B.'s birth, Courtney moved out of the family home, and Austin initiated divorce proceedings. Courtney then began dating Miller, and the two moved in together. Austin was granted provisional physical and legal custody of the children, with Courtney having supervised parenting time. However, after Austin died of a heart attack in late June 2018, Courtney assumed custody of H.B and R.B. Throughout the month of July 2018, the children stayed with numerous family members and friends besides Courtney and Miller. Most often, the children stayed with their paternal grandmother, Jessica Lough.

[3] From July 27 to July 31, Courtney and Miller had care of four-month-old R.B. Courtney worked most of those days, leaving Miller as the sole caretaker of R.B. On July 31, Courtney went to work around 6 a.m., leaving H.B. and R.B. alone with Miller until late afternoon. Around 6:30 p.m., Lough picked up the children and noticed R.B. had an injury to his lip, which she asked Courtney about and Courtney stated it was caused by R.B. scratching himself. Throughout that evening, Lough felt R.B. was "not acting himself" and appeared listless and quiet. Tr. Vol. II p. 166. She phoned Courtney and spoke with Miller, who told her R.B. had vomited earlier in the day. When Lough went to change R.B.'s diaper, she found bruises on his penis, feet, and legs. At that point, she and the child's great-grandmother, Becky Everett, phoned the Department of Child Services (DCS) and took R.B. to the hospital.

[4] At Adams Memorial Hospital, a physical examination of R.B. showed bruising to his lip, back, arm, ear, penis, and roof of his mouth. R.B. vomited twice at the hospital, prompting doctors to order a CT scan. The CT scan revealed R.B. suffered a subdural hematoma. Due to the severity of his injury, R.B. was transferred to Riley Hospital for Children that night. There, a skeletal survey showed fractures to three of R.B.'s right ribs and fractures to two bones in his lower right leg. DCS caseworker Lindsey Eads also examined R.B. and spoke with doctors and family members. R.B. was later adjudicated to be a child in need of services.

[5] Detective Cliff Thomas of the Bluffton Police Department interviewed both Courtney and Miller about R.B.'s injuries. Miller stated that the bruising to

R.B.'s penis occurred when he was holding R.B. and "his arm gave out," causing him to almost drop R.B. and catch him under the groin area. Tr. Vol. III p. 197. Miller stated the injury to R.B.'s mouth occurred when he discovered R.B. with a string in his mouth and had to stick "two fingers down [R.B.'s] throat" to get it out. *Id.* at 199. Detective Thomas also interviewed many of the family members and friends who had watched R.B. that month, including Brittany Bleeke, Courtney's friend and fiancée to Matt Burkholder, R.B.'s paternal uncle. After her interview, Bleeke received a phone call from Miller, in which he threatened to "kill [her] in front of [her] children" if he discovered she had talked to law enforcement. *Id.* at 171.

[6]     The State charged Miller with Level 3 felony domestic battery resulting in serious bodily injury to a person less than fourteen years old (for the subdural hematoma), Level 3 felony neglect of a dependent resulting in a serious bodily injury, Level 6 felony intimidation (for the threat against Bleeke), and Level 5 felony battery resulting in bodily injury to a person less than fourteen years of age (for the bruising to the penis).

[7]     At trial, Dr. John Wagel, the emergency-room physician who treated R.B. at Adams Memorial, and Dr. Shannon Thompson, a Riley Hospital pediatrician and child-abuse expert, both gave similar testimony: R.B.'s injuries could not have been self-inflicted, given he was four months old and lacked the mobility and body strength to cause such injuries; the injuries were not consistent with an accident, nor did the injuries appear to have been caused in the ways Miller described; and the injuries indicated child abuse. Dr. Wagel testified that a

caregiver of a four-month-old would be expected to know that "there was [a head] injury, and that they needed to seek medical attention." *Id.* at 80. Dr. Thompson stated that a caregiver who caused a head injury would notice something "significantly different in that baby initially"—sudden crying or silence, acting stunned, lethargic or listless, abnormal breathing, vomiting, or loss of appetite. *Id.* at 99.

[8]     Much of the doctors' testimony focused on when the injuries occurred. While difficult to date, both doctors opined that all the injuries—the rib fractures, leg fractures, bruises, and subdural hematoma—would have been inflicted within the last month based on healing time. Specifically referring to the subdural hematoma, Dr. Thompson testified it was an "acute" injury that likely occurred "immediately up to three to five days" of the CT scan, while Dr. Wagel stated the injury likely occurred "very shortly before presentation" given R.B.'s vomiting earlier that day, a symptom which would have occurred "within hours" of the initial head injury. *Id.* at 81-82, 100, 101.

[9]     Other witnesses testified about their interactions with Miller. Sarah Anderson, with whom Miller and Courtney briefly resided earlier in July 2018, stated that Miller would often become "short-tempered" and "quickly frustrated" with R.B. *Id.* at 148. Anderson testified that she had witnessed Miller shake R.B. in a manner she felt was "too hard," albeit seemingly in a playful manner. *Id.* at 149. Detective Thomas testified about his interviews with Miller, during which Miller admitted he has been diagnosed with "intermittent explosive rage disorder," which causes him to "get mad about stupid sh** that [he] shouldn't

get mad about." *Id.* at 203. Finally, Bleeke testified about the phone call in which Miller threatened to kill her in front of her kids.

[10] The jury found Miller guilty on all four counts. At sentencing, two DCS workers testified about their interactions with Miller throughout the corresponding CHINS case: he was "domineering," "aggressive," and "threatening" with workers; he refused to participate in offered services; and he interfered with Courtney's communications with DCS and her participation with their services. Tr. Vol. IV p. 36. The trial court identified several aggravating factors: (1) Miller has a criminal history, including two juvenile adjudications for battery and criminal convictions for misdemeanor battery, misdemeanor criminal mischief, felony intimidation, and a federal conviction for felon in possession of a firearm; (2) R.B. was only four months old at the time of the offenses; (3) Miller was on federal supervised release for felon in possession of a firearm at the time of the offenses; and (4) he was in a position of care, custody, and control of R.B. The court found no mitigating factors and sentenced Miller to twelve years for domestic battery, twelve years for neglect, two years for intimidation, and four years for battery. The court ordered the domestic-battery and neglect sentences to be served concurrent to each other but consecutive to the other sentences, for an aggregate term of eighteen years.

[11] Miller now appeals.

# Discussion and Decision

[12] Miller raises two issues on appeal. He contends that the evidence is insufficient to support three of his convictions and that his sentence is inappropriate.

# I. Sufficiency of the Evidence

[13] Miller challenges the sufficiency of the evidence for three of his convictions: domestic battery, neglect of a dependent, and battery.[1] Our standard of review for sufficiency claims is well settled. We do not reweigh evidence or assess the credibility of witnesses. *Gray v. State*, 903 N.E.2d 940, 943 (Ind. 2009). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *Id.*

---

[1] While Miller says in his Summary of Argument that he is challenging the sufficiency of the evidence "for each and every Count," Appellant's Br. p. 18, the only place he addresses the intimidation conviction is in a single sentence in the Conclusion section of his brief, with no citation to the record or any legal authority, *id.* at 28 ("In regards to the intimidation Count, Miller notes that the statements he made were in the heat of the moment and there was no intention to intimidate the person."). As such, he has waived any challenge to that conviction. *See* Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22."); *see also Lyles v. State*, 834 N.E.2d 1035, 1050 (Ind. Ct. App. 2005) (holding appellant had waived argument due to his failure to develop the arguments and support it with citations to authority and the record), *reh'g denied*, *trans. denied*.

[14] The State charged Miller with domestic battery resulting in serious bodily injury based on R.B.'s subdural hematoma. Miller's argument is that the State failed to show he was "directly responsible" for this injury because numerous other individuals could have inflicted it. Appellant's Br. p. 21. This is consistent with his defense at trial, which the jury clearly found unpersuasive. Both doctors testified that the subdural hematoma was a recent injury, which would have been followed by a variety of symptoms, including vomiting and personality changes, both of which were observed in R.B. on the evening of July 31. Miller was the sole caretaker of R.B. for most of that day. The State acknowledged at trial that Courtney, Lough, and Everett also had access to R.B. that day. However, the State presented plenty of evidence for the jury to conclude that—out of the four people—Miller is the one who inflicted this injury. R.B. never exhibited unexplained injuries outside the month he lived with Miller. Miller was diagnosed with intermittent explosive rage disorder and was known to be short tempered and easily frustrated with R.B. Finally, Miller admitted to causing several of R.B.'s other injuries, and although he claims they were accidental, both doctors believed they were intentionally inflicted. The above evidence was sufficient for the jury to conclude Miller caused the subdural hematoma.

[15] To obtain a conviction for Level 3 felony neglect of a dependent resulting in serious bodily injury as charged here, the State must have proven Miller (1) had the care of R.B. and (2) knowingly and intentionally (3) placed R.B. in a situation endangering his life or health (4) resulting in serious bodily injury.

Ind. Code § 35-46-1-4(a)(1); Appellant's App. Vol. II p. 45. The State argued at trial that Miller—having caused the subdural hematoma—knew R.B. had a head injury but failed to seek medical treatment, endangering R.B.'s life or health. Miller argues that the State failed to prove he "caused the brain bleed" and "should have sought out immediate medical treatment" for R.B. Appellant's Br. p. 23. We disagree. The State provided sufficient evidence for the jury to conclude Miller caused the subdural hematoma. Furthermore, Dr. Thompson and Dr. Wagel both testified that, due to R.B.'s young age and immobility, such trauma could not have occurred without the caregiver's knowledge, and a reasonable caregiver would have known such trauma required medical attention. Both doctors also testified this trauma would have an immediate impact on the child: the child would stop or start crying; appear dazed or confused; vomit; breathe irregularly; or have personality changes. Upon picking up R.B. on the evening of July 31, Lough immediately noticed he was not acting like himself and was lethargic and listless. R.B. also threw up multiple times that day, at least once in the presence of Miller. Therefore, given the doctor's timeline and R.B.'s symptoms, it was reasonable for the jury to conclude that Miller was negligent in failing to seek immediate medical treatment for R.B.

[16] Finally, Miller was convicted of Level 5 felony battery for causing the bruising to R.B.'s penis. Miller admitted to Detective Thomas he caused this bruising but claimed it was accidental. Both Dr. Thompson and Dr. Wagel testified this bruising was not consistent with Miller's explanation of events, but rather

indicative of abuse. Whether the bruising was caused by abuse or an accident was a question for the jury. This is a request to reweigh evidence or reassess witness credibility in Miller's favor, which we may not do. *See Gray*, 903 N.E.2d at 943.

[17] There is sufficient evidence for all three of the challenged convictions.

# II. Sentence

[18] Miller next contends that his eighteen-year sentence is inappropriate and asks us to reduce it pursuant to Indiana Appellate Rule 7(B), which provides that an appellate court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014) (citing *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008)). Because we generally defer to the judgment of trial courts in sentencing matters, defendants have the burden of persuading us that their sentences are inappropriate. *Schaaf v. State*, 54 N.E.3d 1041, 1044-45 (Ind. Ct. App. 2016).

[19] Miller was convicted of two Level 3 felonies, a Level 5 felony, and a Level 6 felony. A person who commits a Level 3 felony shall be imprisoned for a fixed term of between three and sixteen years, with an advisory sentence of nine

years. Ind. Code § 35-50-2-5. A person who commits a Level 5 felony shall be imprisoned for a fixed term of between one and six years, with an advisory sentence of three years. Ind. Code § 35-50-2-6. A person who commits a Level 6 felony shall be imprisoned for a fixed term of between six months and two-and-a-half years, with an advisory sentence of one year. Ind. Code § 35-50-2-7. The court sentenced Miller to an above-advisory sentence for each of the four counts: twelve years each for the Level 3 felonies, to be served concurrently; four years for the Level 5 felony; and two years for the Level 6 felony.

[20] Regarding the nature of the offenses, Miller acknowledges that R.B.'s injuries are "particularly egregious." Appellant's Br. p. 25. At just four months old, R.B. had such a "constellation" of injuries that multiple doctors immediately suspected abuse. Tr. Vol. III p. 116. R.B. suffered bruises all over his body, rib and leg fractures, and a dangerous brain bleed. Despite these alarming injuries and being in a position of care and control of R.B., Miller sought no medical attention. Furthermore, when a family friend spoke to law enforcement about the case, he threatened to kill her in front of her children.

[21] Additionally, Miller's character justifies this sentence. Miller has a criminal history—two juvenile adjudications for battery and criminal convictions for misdemeanor battery, misdemeanor criminal mischief, felony intimidation, and a federal conviction for felon in possession of a firearm. He was on probation for the federal conviction when he committed the current offenses. And two DCS workers testified at the sentencing hearing that Miller exhibited

threatening and aggressive behavior toward them, refused to participate in rehabilitative services, and prevented the child's mother from doing so as well.

[22] Nothing about Miller's actions or his character has convinced us his sentence is inappropriate.

[23] Affirmed.

Bailey, J., and Baker, Sr. J., concur.