Ty EVANS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0601–CR–81.

Court of Appeals of Indiana.

Oct. 19, 2006.

Rehearing Denied Dec. 14, 2006.

3. In addition, the provisions headed "MET-RO" apply only to Marion County.

Elizabeth A. Gabig, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Ty Evans appeals his convictions and sentence for attempted murder[1] and re-

---

1. Ind.Code §§ 35–41–5–1, 35–42–1–1.

sisting law enforcement.[2] We affirm.

## Issues

Evans raises three issues, which we restate as follows:

I. Whether the prosecutor committed misconduct during closing argument;

II. Whether the trial court abused its discretion in denying his motion for mistrial; and

III. Whether the trial court abused its discretion in denying his motion to continue the sentencing hearing.

## Facts and Procedural History

Evans occasionally paid nineteen-year-old Melinda Keedy to clean his house, do his laundry, and care for his yard. Keedy kept all her belongings at Evans's home and sometimes stayed there. Evans and Keedy were also partners in a scheme to commit bank fraud in Tennessee and Kentucky. Evans created false identity papers for Keedy that she used to open a bank account as well as checks that Keedy deposited in that bank account. He created these checks by stealing mail from mailboxes and copying information from the checks he found therein. Keedy would deposit or cash the checks created by Evans using a false thumbprint. However, in early May 2005, Keedy used her actual thumbprint to cash a check. When she informed Evans that she had done so, he became very angry. Evans was afraid the police would catch them, and he decided to kill Keedy.

On May 15, 2005, Evans contacted his friend and employee, Billy Neely, and offered him an unspecified job for which Neely could earn three or four thousand dollars. On May 16, 2005, Neely went to Evans's house. Evans then told Neely that he wanted to kill Keedy, whom Neely also knew. Evans explained the plan to Neely: Evans had told Keedy that he was going to rob a house in Geist that night, and Keedy had agreed to drive him. Keedy was to meet Evans at a grocery store where he would pick her up. After Evans picked up Keedy, he would bring her back to his house, where Neely would be waiting. Once inside the house, Evans would strangle Keedy with a rope while Neely remained ready to apprehend Keedy should she attempt to escape. Evans would wash the body in a wading pool to remove any evidence and place it in a box, both of which he had in his garage. Finally, Neely would bury Keedy in an excavation for a new house. After explaining the plan, Evans drove Neely to the construction site where Neely was to bury Keedy. They then returned to Evans's house, and Neely waited there while Evans picked up Keedy.

Evans, however, was unaware that Keedy had agreed to act as a police informant. A few days earlier, Ryan Stephenson, Keedy's intermittent boyfriend, had contacted United States Postal Inspector Richard Petry and provided him with information regarding Evans and Keedy's bank fraud scheme. On May 16, 2005, at approximately 5:00 p.m., Inspector Petry learned of Keedy's location, and Indianapolis police officers pulled Keedy over. Keedy admitted her involvement in the bank fraud scheme and agreed to accompany Inspector Petry to his office for an interview. On the way to Inspector Petry's office, Keedy told him about the robbery she was to help Evans with that very evening. Inspector Petry immediately stopped his car and contacted the Indianapolis Police Department. Keedy drove with police officers to the home that she thought Evans had targeted for the rob-

2. Ind.Code § 35–44–3–3.

bery. The police formulated a plan wherein Keedy would meet Evans as planned, and while under police surveillance, they would drive to the Geist home, and the officers would interrupt the robbery before it occurred. Keedy agreed to wear a wire. The police put the wire on Keedy, and she went to meet Evans at the grocery store.

At approximately 7:30 p.m., Keedy arrived at the grocery store parking lot. Evans was waiting there as planned. Keedy got in his car, but Evans did not drive to the Geist house. Instead, he drove to his house, explaining to Keedy that he had to get his gun. Evans parked his car in his garage and closed the garage door. Just before she exited the car, Keedy saw Evans put a glove on his left hand. She entered the house in front of Evans. After she had taken a step or two, Evans put a rope around her neck, started strangling her, pulled her to the ground, and said: "You robbed the wrong motherfucker this time, didn't ya? $2,000 out of my dresser. It's all over with bitch. You can't be trusted. About two minutes, it'll be all over. This ain't no game. .... You were told." State's Exhibits 10, 11. Neely was also in the house and made derogatory comments to Keedy. Evans continued, saying, "Yeah, you were told time and time again to keep your ... mouth shut." *Id.*

Meanwhile, the police officers monitoring the transmission from Keedy's wire realized something was wrong and attempted to enter the house. Evans's house had two doors. Some officers ran to the front door, while Officers Jeffrey Krider, Dewey Poskon, and Jeffrey Avington ran to the side door. Next to the side door, there was a full-length window approximately three feet wide. Officer Poskon looked in the window and saw a pool table. On the other side of the pool table, he saw two pairs of legs, perpendicular to

each other. One set of legs was bare, and the other set had on light blue jeans. Officer Poskon yelled, "They're in there." Tr. at 235. The officers yelled, "Police," and tried to open the door, but it was locked. *Id.* at 244. Officer Avington attempted to kick the door open three times, but it would not open. Evans came to the window and said that he could not open the door. Officer Avington kicked the door once more, and it opened. He rushed in and ran after Neely, who had jumped over the banister and run up the stairs. Neely had on a hooded sweatshirt, brown work pants, and brown boots. Neely ran to the front door and unlocked it, allowing the officers there to enter. After the officers subdued Neely, Officer Avington returned to the room in which Keedy lay.

Meanwhile, Officer Krider had knocked Evans down. Evans was wearing light blue jeans. Officer Krider attempted to subdue Evans, who continued to fight. Evans was face down and was kicking and bucking while Officer Krider was on his back. Officer Poskon went to the other side of the pool table and saw Keedy face down with her head in the fireplace. He yelled for an ambulance and then went to assist Officer Krider in subduing Evans. Having returned to the room, Officer Avington went to help Keedy. He turned her over and removed the rope from around her neck. She had blood on her face and was foaming at the mouth; her eyes were rolled back in her head; and she had urinated on herself. He was unsure whether she was dead or alive. After a few seconds, Keedy gasped and started to cough and moan. Her face was "cherry red" due to the extensive hemorrhaging, she had an abrasion on her neck from the rope, her voice was raspy and hoarse, she was gasping for breath and hyperventilating, and she had difficulty swallowing. *Id.* at 468. However, she was able to indicate that Evans was the person who had at-

tempted to strangle her. At some point, the police were able to handcuff Evans.

Police found two gloves in the room and two other gloves that Neely had dropped as he attempted to flee. Inside Evans's garage, police found a small wading pool, a box large enough to hold a grown adult, a bottle of acid, a bottle of 409 spray, three bottles of isopropyl alcohol, and two packs of disposable rubber gloves. In Evans's car, police found two bags of ready mix concrete, a shovel, a pick ax, a big heavy-duty trash bag, a towel, and a complete change of clothes. A brown paper grocery bag was taped over the overhead dome light. Neely showed police the construction site where he was supposed to bury Keedy's body.

On May 18, 2005, the State charged Evans with class A felony attempted murder, class B felony aggravated battery, class B felony criminal confinement, and class D felony resisting law enforcement. On October 12, 2005, the State amended the information to include a habitual offender charge.

A jury trial was held December 12, 13, and 14, 2005. The jury found Evans guilty as charged. Evans admitted to being a habitual offender. The sentencing hearing was scheduled for January 6, 2006. On January 5, 2006, Evans filed a motion to continue the sentencing hearing, stating that the presentence investigation report had not been filed as of January 4, 2006, and it now appeared that he might benefit from the assistance of a sentencing consultant. The trial court denied the motion. The presentence investigation report was filed January 5, 2006. Evans did not renew the motion at the sentencing hearing. The trial court vacated the aggravated battery and criminal confinement convictions on double jeopardy grounds. The trial court imposed a forty-year sentence for Evans's attempted murder conviction, en-

hanced by thirty years for the habitual offender finding, and a one-year sentence for the resisting law enforcement conviction, to be served consecutively, for an aggregate sentence of seventy-one years. Evans now appeals.

## Discussion and Decision

### I. Prosecutorial Misconduct

■ Evans argues that the prosecutor committed misconduct during closing argument. The essential facts are as follows. Evans did not testify at trial. During closing arguments, defense counsel asserted that the voice on the recording of Keedy's wire transmission that the State had identified as Evans's was actually Neely's voice. As the prosecutor was arguing on rebuttal that Evans attempted to kill Keedy, Evans twice shouted, "No, I didn't," followed by, "I never put my hands on her and you know it, you know it, and you know it's a fact." *Id.* at 920. The trial court ordered the bailiff to take the jury out. Evans continued yelling, "Never touched her. Never touched her. Never touched Melinda Keedy." *Id.* After the jury was removed, the State moved for a mistrial, which the trial court denied. The trial court had Evans removed from the courtroom. As Evans was being escorted to his cell, he said to the deputies, "I don't have a problem with any of you guys and I just wanted to put on a show for the Court." *Id.* at 932.

The prosecutor indicated to the trial court that, in the remaining portion of his rebuttal, he wanted to say, "Now, you've heard his voice." *Id.* at 934. The defense objected, but the trial court allowed the comment. The jury returned to the courtroom, and the trial court instructed the jury that "any statements made by Mr. Evans are not to be considered as evidence. You are to disregard any statement or comments that were previously

made by Mr. Evans." *Id.* At the end of his rebuttal argument, the prosecutor said, "Now you've heard his voice," and played a portion of the recorded wire transmission. *Id.* at 935. The defense did not request an admonishment or move for mistrial.

 Specifically, Evans claims that the prosecutor's statement constitutes prosecutorial misconduct because it was an improper reference to his right to remain silent guaranteed by the Fifth Amendment of the United States Constitution.[3] We cannot agree.

> If an appellant properly preserves the issue of prosecutorial misconduct for appeal the reviewing court first determines whether misconduct occurred, and if so whether it had a probable persuasive effect on the jury. Although often phrased in terms of grave peril, a claim of improper argument to the jury is measured by the probable persuasive effect of any misconduct on the jury's decision and whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant.

*Ritchie v. State,* 809 N.E.2d 258, 268–69 (Ind.2004) (citations and quotation marks omitted).

Initially, we note that the context in which Evans raises this issue is inappropriate. We do not see how the prosecutor's statement may be described as misconduct when the trial court granted the prosecutor permission to make the statement. Rather, the proper context in which to frame the issue would be in terms of trial court error: namely, that the trial

court erred in allowing the prosecutor to make the statement.

 Even assuming that the issue was properly framed in terms of prosecutorial misconduct, Evans failed to request an admonishment or move for mistrial. He has therefore waived this issue. *See Flowers v. State,* 738 N.E.2d 1051, 1058 (Ind. 2000) (stating that to preserve an issue regarding the propriety of a closing argument for appeal, a defendant must request an admonishment, and if further relief is desired, defendant must move for mistrial).

 Waiver notwithstanding, Evans's argument must fail. Generally, when a prosecutor makes a comment that the jury could reasonably interpret as an invitation to draw an adverse inference from the defendant's decision not to testify, the defendant's Fifth Amendment privilege against self-incrimination is violated. *Haycraft v. State,* 760 N.E.2d 203, 208 (Ind.Ct.App.2001), *trans. denied* (2002). Evans contends that if the jury obeyed the trial court's admonishment, the only inference to be drawn from the prosecutor's comment is an improper inference of his guilt from his silence at trial. We disagree. Contrary to Evans's assertion that the trial court admonished the jury not to consider the *sound* of Evans's voice, the trial court's admonishment instructed the jury to ignore the *substance* of Evans's comments. Notwithstanding Evans's argument that the identity of the male voices on the recording was of significant importance, the trial court would not have allowed the prosecutor to say, "Now you've heard his voice," if the jury were not permitted to consider the sound of Evans's voice.[4]

---

3. Evans also refers to Article 1, Section 14 of the Indiana Constitution. However, he makes no argument based on that section. Consequently, this issue is deemed waived. *See Haviland v. State,* 677 N.E.2d 509, 513 n. 2 (Ind.1997) (stating that defendant's Article

1, Section 14 argument was waived because he failed to make a separate argument resting on that section). We therefore analyze only Evans's Fifth Amendment claim.

4. In fact, the identity of the male voices was not as significant as Evans contends. The

We will not reverse if the prosecutor's comment, in its totality, focuses on evidence other than the defendant's failure to testify. *Id.* "Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Dumas v. State*, 803 N.E.2d 1113, 1118 (Ind.2004). Here, the prosecutor's statement was in no sense directed toward Evans's decision not to testify, but rather was specifically focused on the fact that Evans had voluntarily spoken in front of the jury. The prosecutor's statement was in direct response to defense counsel's argument that the voice on the recording was actually Neely's voice, as well as to Evans's voluntary outburst. We think it would be grossly unfair to allow Evans to sabotage his own trial by making such an outburst. Accordingly, we conclude that the prosecutor's comment does not constitute a violation of Evans's Fifth Amendment right to remain silent. *See Lyles v. State*, 834 N.E.2d 1035, 1047 (Ind.Ct.App. 2005) (concluding that prosecutor's statement made in response to defense counsel's closing argument and suggesting that defendant's videotaped statement did not deserve same weight and credibility as testimony of State's sworn witnesses was not a comment on defendant's decision not to testify), *trans. denied.*

## II. Mistrial

Evans next contends that the trial court abused it discretion in denying his motion for mistrial. The relevant facts follow. Keedy testified for the State. The prosecutor asked Keedy to describe what the police had directed her to do while she was in the car with Evans. Keedy replied, "I was supposed to get in his car, like planned, and me and [Evans] was suppose to go straight from Kroger to Geist. And I—I was—the only thing I was suppose to do was to get him to talk about the gun. And when he talked about havin' a gun—because he was on probation or parole—he wasn't allowed to have a gun[.]" Tr. at 586. Defense counsel objected and moved for mistrial. The trial court took the motion under advisement until Keedy had finished testifying. The trial court sustained the objection and offered to strike Keedy's response from the record and instruct the jury as follows: "[T]he Court is going to strike the last answer from the record, and you're not to consider it." *Id.* at 588. The defense refused the trial court's offer to strike.

After Keedy finished testifying, a conference was held outside the presence of the jury, in which the trial court denied Evans's motion for mistrial. After both parties rested, the trial court admonished the jury that "the evidence that was introduced regarding other alleged criminal activity or prior bad acts, including any allegations of being on probation or parole were not—are not to be considered by you as proof of [Evans's] propensity to act in a criminal way." *Id.* at 832. The trial court repeated this admonishment again in its final instructions.

In resolving whether the trial court erred in denying Evans's motion for mistrial, we note that

A mistrial is an extreme remedy warranted only when no other curative measure will rectify the situation. The determination of whether to grant a mistrial is within the trial court's discretion, and we will reverse only for an abuse of that discretion. An abuse of discretion

---

jury was provided with an instruction on accomplice liability. The record establishes that there was sufficient evidence to convict Evans as an accomplice even if Neely was the one who actually strangled Keedy.

has occurred if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court. We accord great deference to the trial court's decision, as it is in the best position to gauge the circumstances and the probable impact on the jury. When determining whether a mistrial is warranted, we must consider whether the defendant was placed in a position of grave peril to which he should not have been subjected. The gravity of the peril is determined by the probable persuasive effect of the matter complained of on the jury's decision.

*Kirby v. State*, 774 N.E.2d 523, 533–34 (Ind.Ct.App.2002) (citations omitted), *trans. denied* (2003). However, "reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings." *Bradley v. State*, 649 N.E.2d 100, 108 (Ind.1995).

Specifically, Evans asserts that Keedy's comment violated a motion in limine and, because it referred to his criminal history, was highly prejudicial. We disagree.

Evans's trial lasted three days, resulting in a transcript of approximately 1,000 pages. During the entire trial, the sole reference to Evans's criminal past was Keedy's brief reference that he was on probation or parole. Further, the State presented overwhelming evidence of Evans's guilt. Keedy and Neely presented eyewitness testimony, which was corroborated by the circumstantial evidence; the police interrupted the crime while it was being committed, so there was no issue as to Evans's identity or involvement; and the crime was recorded by means of Keedy's wire transmission, which was presented to the jury. Under these circumstances, the probable persuasive effect of Keedy's comment on the jury is insignificant. *See Burks v. State*, 838 N.E.2d 510, 520 (Ind.Ct.App.2005) (holding that brief reference to other shooting was harmless error in light of overwhelming evidence of defendant's guilt), *trans. denied* (2006).

Moreover, the trial court twice provided a proper admonishment to the jury. Even where a witness violates a motion in limine, a trial court may determine that a mistrial is not warranted and, instead, admonish the jury to disregard the improper testimony. *See Underwood v. State*, 644 N.E.2d 108, 111 (Ind.1994) (holding that admonishment, not mistrial, was appropriate where police officer made statement in violation of ruling on motion in limine). Nevertheless, Evans urges that the trial court's admonishment was insufficient to cure the harm because it was given after Keedy had finished testifying and not immediately after the statement was made. However, Evans rejected the trial court's offer to immediately strike Keedy's comment and instruct the jury to disregard it. Evans may not now claim that the trial court's delayed admonishment was insufficient. We conclude that the trial court did not abuse its discretion in denying Evans's motion for mistrial.

### III. Motion for Continuance

Evans asserts that the trial court abused its discretion in denying his motion to continue the sentencing hearing. The decision whether to grant a continuance, when the motion is not based upon statutory grounds, lies within the discretion of the trial court and will not be reversed absent a clear showing of an abuse of discretion. *Harris v. State*, 659 N.E.2d 522, 527 (Ind.1995). The appellant must overcome a strong presumption that the trial court properly exercised its discretion. *Warner v. State*, 773 N.E.2d 239, 247 (Ind.2002). "Additionally, the defendant must make a specific showing of how he was prejudiced as a result of the trial

court's denial of his motion." *Harris,* 659 N.E.2d at 527.

■ Here, Evans filed his motion for continuance one day before the sentencing hearing claiming that he did not have sufficient time to review the presentence investigation report. Evans had a team of three attorneys, which had three weeks to prepare for the sentencing hearing. While we acknowledge that the presentence investigation report was not filed until the day before the hearing, we note that other than his criminal history, which is a matter of public record, Evans provided the vast majority of information in the report. We also note that at the sentencing hearing, Evans indicated to the trial court that he was ready to proceed and had had an opportunity to read over the report, and he never indicated that there was any information in the report that came as a surprise to him.

■ Additionally, Evans's motion for continuance states, "That given [Evans's] demeanor, during the trial, and in the aftermath of the same, it now appears, that he would benefit from the type of assistance that a Sentencing Consultant might provide, including the compilation of mitigation evidence that might assist the court in arriving at an appropriate sentence." Appellant's App. at 255. We think the statement that a sentencing consultant *might* provide mitigation evidence is speculative and vague. Evans provided no indication as to whether the likelihood that mitigation evidence would be provided was significant, and he did not identify, even generally, what kind of mitigation evidence a sentencing consultant might provide. Evans himself admits, "Evans's circumstances did not allow for a detailed presentation of exactly what specific evidence of his particular mitigation might have been given the very limited time." Appellant's Br. at 13.

■ Nevertheless, on appeal Evans contends that he "was prejudiced when the court refused to allow an extension of time to allow his counsel to investigate and flesh out the possible mitigating factor of his declining mental health." Appellant's Br. at 13. In addressing this contention, we think that *Anderson v. State,* 695 N.E.2d 156 (Ind.Ct.App.1998), is instructive. In *Anderson,* the defendant appealed the denial of his motion to continue his sentencing hearing. Anderson's motion was based on a statement that counsel wanted to investigate his medical records concerning his treatment for schizophrenia. We concluded that Anderson had failed to establish prejudice, stating that Anderson had not produced evidence that actual records existed and did not demonstrate what those records would prove. *Id.* at 158.

■ Here, the record demonstrates that Evans did not have a history of mental illness. We recognize that the presentence investigation report shows that Evans reported that since his arrest, he had experienced anxiety and might be in need of mental health evaluation and treatment. However, he also stated that his mental and emotional health was "good," indicating that any mental health concerns he had were minor. PSI at 12. Even if Evans had begun experiencing significant mental health issues subsequent to his arrest, "mental illness is a mitigating factor to be used in certain circumstances, such as when the evidence demonstrates long-standing mental health issues or when the jury finds that a defendant is mentally ill." *Ousley v. State,* 807 N.E.2d 758, 762 (Ind. Ct.App.2004). Evans has not established any longstanding mental health issues, and the jury did not find him mentally ill.

■ Furthermore, a defendant's mental illness is afforded mitigating weight in

circumstances that establish a nexus between the mental illness and the offense for which the defendant is being sentenced. *Corralez v. State*, 815 N.E.2d 1023, 1026 (Ind.Ct.App.2004). Evans has not demonstrated any such nexus, and therefore, any mental illness that might have been discovered would not be a significant mitigating factor. Accordingly, we conclude that the trial court did not abuse its discretion in denying Evans's motion for continuance.

Affirmed.

BAKER, J., and VAIDIK, J., concur.