**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



APPELLANT PRO SE:

**TY EVANS**
Pendleton, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TY EVANS, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1112-PC-697 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robert R. Altice. Jr., Judge
Cause No. 49G02-0505-PC-82867

**August 8, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Ty Evans appeals the post-conviction court's judgment denying his petition for post-conviction relief. Evans raises seven issues for our review, which we consolidate and restate as the following two issues:

1.  Whether his freestanding claim that the State destroyed material, exculpatory evidence is available for post-conviction review; and

2.  Whether he received ineffective assistance from his trial counsel.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts underlying Evans' convictions were stated by this court in his direct appeal:

> Evans occasionally paid nineteen-year-old Melinda Keedy to clean his house, do his laundry, and care for his yard. Keedy kept all her belongings at Evans's home and sometimes stayed there. Evans and Keedy were also partners in a scheme to commit bank fraud in Tennessee and Kentucky. Evans created false identity papers for Keedy that she used to open a bank account as well as checks that Keedy deposited in that bank account. He created these checks by stealing mail from mailboxes and copying information from the checks he found therein. Keedy would deposit or cash the checks created by Evans using a false thumbprint. However, in early May 2005, Keedy used her actual thumbprint to cash a check. When she informed Evans that she had done so, he became very angry. Evans was afraid the police would catch them, and he decided to kill Keedy.
>
> On May 15, 2005, Evans contacted his friend and employee, Billy Neely, and offered him an unspecified job for which Neely could earn three or four thousand dollars. On May 16, 2005, Neely went to Evans's house. Evans then told Neely that he wanted to kill Keedy, whom Neely also knew. Evans explained the plan to Neely: Evans had told Keedy that he was going to rob a house in Geist that night, and Keedy had agreed to drive him. Keedy was to meet Evans at a grocery store where he would pick her up. After Evans picked up Keedy, he would bring her back to his house, where Neely would be waiting. Once inside the house, Evans would strangle Keedy with a rope while Neely remained ready to apprehend

2

Keedy should she attempt to escape. Evans would wash the body in a wading pool to remove any evidence and place it in a box, both of which he had in his garage. Finally, Neely would bury Keedy in an excavation for a new house. After explaining the plan, Evans drove Neely to the construction site where Neely was to bury Keedy. They then returned to Evans's house, and Neely waited there while Evans picked up Keedy.

Evans, however, was unaware that Keedy had agreed to act as a police informant. A few days earlier, Ryan Stephenson, Keedy's intermittent boyfriend, had contacted United States Postal Inspector Richard Petry and provided him with information regarding Evans and Keedy's bank fraud scheme. On May 16, 2005, at approximately 5:00 p.m., Inspector Petry learned of Keedy's location, and Indianapolis police officers pulled Keedy over. Keedy admitted her involvement in the bank fraud scheme and agreed to accompany Inspector Petry to his office for an interview. On the way to Inspector Petry's office, Keedy told him about the robbery she was to help Evans with that very evening. Inspector Petry immediately stopped his car and contacted the Indianapolis Police Department. Keedy drove with police officers to the home that she thought Evans had targeted for the robbery. The police formulated a plan wherein Keedy would meet Evans as planned, and while under police surveillance, they would drive to the Geist home, and the officers would interrupt the robbery before it occurred. Keedy agreed to wear a wire. The police put the wire on Keedy, and she went to meet Evans at the grocery store.

At approximately 7:30 p.m., Keedy arrived at the grocery store parking lot. Evans was waiting there as planned. Keedy got in his car, but Evans did not drive to the Geist house. Instead, he drove to his house, explaining to Keedy that he had to get his gun. Evans parked his car in his garage and closed the garage door. Just before she exited the car, Keedy saw Evans put a glove on his left hand. She entered the house in front of Evans. After she had taken a step or two, Evans put a rope around her neck, started strangling her, pulled her to the ground, and said: "You robbed the wrong motherfucker this time, didn't ya? $2,000 out of my dresser. It's all over with bitch. You can't be trusted. About two minutes, it'll be all over. This ain't no game. . . . You were told." State's Exhibits 10, 11. Neely was also in the house and made derogatory comments to Keedy. Evans continued, saying, "Yeah, you were told time and time again to keep your . . . mouth shut." Id.

Meanwhile, the police officers monitoring the transmission from Keedy's wire realized something was wrong and attempted to enter the house. Evans's house had two doors. Some officers ran to the front door, while Officers Jeffrey Krider, Dewey Poskon, and Jeffrey Avington ran to

the side door. Next to the side door, there was a full-length window approximately three feet wide. Officer Poskon looked in the window and saw a pool table. On the other side of the pool table, he saw two pairs of legs, perpendicular to each other. One set of legs was bare, and the other set had on light blue jeans. Officer Poskon yelled, "They're in there." Tr. at 235. The officers yelled, "Police," and tried to open the door, but it was locked. Id. at 244. Officer Avington attempted to kick the door open three times, but it would not open. Evans came to the window and said that he could not open the door. Officer Avington kicked the door once more, and it opened. He rushed in and ran after Neely, who had jumped over the banister and run up the stairs. Neely had on a hooded sweatshirt, brown work pants, and brown boots. Neely ran to the front door and unlocked it, allowing the officers there to enter. After the officers subdued Neely, Officer Avington returned to the room in which Keedy lay.

Meanwhile, Officer Krider had knocked Evans down. Evans was wearing light blue jeans. Officer Krider attempted to subdue Evans, who continued to fight. Evans was face down and was kicking and bucking while Officer Krider was on his back. Officer Poskon went to the other side of the pool table and saw Keedy face down with her head in the fireplace. He yelled for an ambulance and then went to assist Officer Krider in subduing Evans. Having returned to the room, Officer Avington went to help Keedy. He turned her over and removed the rope from around her neck. She had blood on her face and was foaming at the mouth; her eyes were rolled back in her head; and she had urinated on herself. He was unsure whether she was dead or alive. After a few seconds, Keedy gasped and started to cough and moan. Her face was "cherry red" due to the extensive hemorrhaging, she had an abrasion on her neck from the rope, her voice was raspy and hoarse, she was gasping for breath and hyperventilating, and she had difficulty swallowing. Id. at 468. However, she was able to indicate that Evans was the person who had attempted to strangle her. At some point, the police were able to handcuff Evans.

Police found two gloves in the room and two other gloves that Neely had dropped as he attempted to flee. Inside Evans's garage, police found a small wading pool, a box large enough to hold a grown adult, a bottle of acid, a bottle of 409 spray, three bottles of isopropyl alcohol, and two packs of disposable rubber gloves. In Evans's car, police found two bags of ready mix concrete, a shovel, a pick ax, a big heavy-duty trash bag, a towel, and a complete change of clothes. A brown paper grocery bag was taped over the overhead dome light. Neely showed police the construction site where he was supposed to bury Keedy's body.

4

On May 18, 2005, the State charged Evans with class A felony attempted murder, class B felony aggravated battery, class B felony criminal confinement, and class D felony resisting law enforcement. On October 12, 2005, the State amended the information to include a[n] habitual offender charge.

A jury trial was held December 12, 13, and 14, 2005. The jury found Evans guilty as charged. Evans admitted to being a[n] habitual offender. . . . The trial court vacated the aggravated battery and criminal confinement convictions on double jeopardy grounds. The trial court imposed a forty-year sentence for Evans's attempted murder conviction, enhanced by thirty years for the habitual offender finding, and a one-year sentence for the resisting law enforcement conviction, to be served consecutively, for an aggregate sentence of seventy-one years. . . .

Evans v. State, 855 N.E.2d 378, 381-83 (Ind. Ct. App. 2006), trans. denied.

After we affirmed his convictions and sentence on direct appeal, on August 3, 2007, Evans filed his petition for post-conviction relief, which he later amended. The post-conviction court held multiple evidentiary hearings on Evans' claims. On November 16, 2011, the post-conviction court entered thorough findings of fact and conclusions of law in which it denied Evans' petition. This appeal ensued.

**DISCUSSION AND DECISION**

**Standard of Review**

Evans appeals the post-conviction court's denial of his petition for post-conviction relief. As we have explained:

[The petitioner] bore the burden of establishing the grounds for post-conviction relief by a preponderance of the evidence. See Ind. Post-Conviction Rule 1(5); Timberlake v. State, 753 N.E.2d 591, 597 (Ind. 2001). Post-conviction procedures do not afford a petitioner with a super-appeal, and not all issues are available. Timberlake, 753 N.E.2d at 597. Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. Id. If an issue was known and available, but not raised on direct appeal, it is waived. Id. If it was raised on appeal, but decided adversely, it is res judicata. Id.

5

In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting the post-conviction court's judgment. Hall v. State, 849 N.E.2d 466, 468 (Ind. 2006). The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. Id. at 468-69. Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues [the petitioner] must convince this court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. See Timberlake, 753 N.E.2d at 597. We will disturb the decision only if the evidence is without conflict and leads only to a conclusion contrary to the result of the post-conviction court. Id.

Lindsey v. State, 888 N.E.2d 319, 322 (Ind. Ct. App. 2008), trans. denied. Further: "[a] defendant in a post-conviction proceeding may allege a claim of fundamental error only when asserting either (1) deprivation of the Sixth Amendment right to effective assistance of counsel, or (2) an issue demonstrably unavailable to the petitioner at the time of his or her trial and direct appeal." Id. at 325 (quotations and alterations omitted); see also State v. Hernandez, 910 N.E.2d 213, 216 (Ind. 2009) (same).

Evans argues that the post-conviction court erred for two reasons. First, Evans argues that the State "destroyed the original [wire] recording of the incident and replaced it with an altered version." Appellant's Br. at 7. And, second, he asserts that he was denied the effective assistance of trial counsel. We address each argument in turn.

**Issue One: Freestanding Error**

Evans first claims that the wire recording of his attack on Keedy was not the original recording but a nefarious replacement invented by the State. The post-conviction court, after noting that Evans could not raise a freestanding claim of error in his petition for post-conviction relief, concluded that Evans could not show that this claim was newly discovered evidence and that, in any event, Evans' evidence in support of his claim was

6

not worthy of credit.  On appeal, Evans asserts that "[t]he court considered [this] issue under the wrong standard of review[,] the rubric of newly discovered evidence, a claim Evans has never made and that is inapplicable to the facts.  The evidence was available before trial . . . ."  Id.

Evans concedes that the evidence supporting this claim was available before his trial.  Thus, it is undisputed that the contents of the recording were known to Evans at the time of trial.  Nonetheless, Evans did not challenge the tape and preserve the issue at trial, or raise the issue on direct appeal.  The State observes correctly that Evans cannot simultaneously claim that he knew about alleged problems with the tape prior to his trial yet argue that this claim was unavailable to him on direct appeal.  Appellee's Br. at 11.  "If an issue was known and available, but not raised on direct appeal, it is waived."  Lindsey, 888 N.E.2d at 322.  Thus, Evans' first issue is not available for post-conviction review.

**Issue Two:  Ineffective Assistance of Counsel**

Evans also asserts that he received ineffective assistance from his trial counsel[1] for numerous reasons.  A claim of ineffective assistance of counsel must satisfy two components.  Strickland v. Washington, 466 U.S. 668 (1984).  First, the defendant must show deficient performance:  representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment.  Id. at 687-88.  Second, the defendant must show prejudice:  a reasonable probability (i.e., a probability sufficient to undermine

---

[1] Evans had several trial attorneys throughout the course of the State's prosecution.

confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694.

Further, "[d]eliberate choices by some attorneys for some tactical or strategic reason do not establish ineffective assistance of counsel even though such choices may be subject to criticism or the choices ultimately prove to be detrimental to the defendant." Robles v. State, 612 N.E.2d 196, 198 (Ind. Ct. App. 1993). Indeed, "[w]e recognize that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or most effective way to represent a client and therefore . . . we will assume that counsel performed adequately, and [we] will defer to counsel's strategic and tactical decisions." Mallory v. State, 954 N.E.2d 933, 936 (Ind. Ct. App. 2011) (citing Smith v. State, 765 N.E.2d 578, 585 (Ind. 2002)).

Here, Evans asserts that his trial counsel were ineffective for the following six reasons[2]: (1) they failed to pursue as the theory of defense that Evans was not Keedy's attacker; (2) they failed to ask the court to admit statements Evans had purportedly made to the police on the theory that those statements were excited utterances and therefore not hearsay; (3) they allowed the State to present inadmissible evidence of bank fraud allegations pending against Evans; (4) they failed to object to an allegedly defective jury instruction; (5) they failed to investigate the authenticity of the State's audio recording; and (6) they permitted the State to introduce an inaccurate transcript of the State's audio recording. We agree with the post-conviction court that Evans' first three arguments call

---

[2] We have reordered Evans' six arguments for ease of discussion.

into question his counsel's strategic decisions and Evans' last three arguments do not demonstrate the requisite prejudice. We address Evans' arguments accordingly.

Counsel's Strategy

Evans' first three arguments all go to his counsel's strategic decisions, which we will not reconsider. See id. As the post-conviction court found:

> In analyzing Evans's claims on these issues, at the outset it is important to understand exactly what the initial theory of the defense was. Attorney Jeffrey Mendes testified at the evidentiary hearing that before trial the plan was to make Ty Evans's lack of intent to kill the focus of the defense. This defense theory was clearly the product of Mendes's discussions with Evans, and was arrived at based on Evans's assertions to Mendes about statements that he allegedly made shortly after the crime occurred. Mr. Mendes testified that Evans's explanations consisted of insisting that he was "only trying to scare" the victim. At the evidentiary hearing, Evans acknowledged that this was going to be the focus for the defense.
>
> Defense counsel promoted this strategy through their cross-examination of the victim and of Billy Neely, and Det. Krider. During their cross-examination of Neely defense counsel painted an extremely unflattering picture of the victim, and they pointed out issues that directly impinged on Neely's intent to commit murder. Through cross-examination of the victim they established that she was a drug abuser who may have been under the influence of drugs at the time of the attack. They also established that she was a thief and a liar and that she was promiscuous. Additionally, the cross[-]examination of the victim certainly underscored the notion that she was potentially biased in favor of Billy Neely, because she was "infatuated" with him and because she chose to sue Ty Evans and not Billy Neely for civil damages resulting from the attack. Counsel also made the point that she only had seconds to make observations of her attackers before she became unconscious. Through cross[-]examination of Det. Krider, defense counsel attempted to introduce evidence of Evans's arguably exculpatory statements, but were prevented by the State's hearsay objection.
>
> As a result of their ostensibly successful cross[-]examination, it is clear that defense counsel were convinced that they had successfully undermined Keedy's and Neely's credibility in the eyes of the jury. This was not an unreasonable conclusion . . . .

9

It is also clear that trial counsel['s] initial strategy was to additionally get evidence of Evans's intent and the details of his involvement admitted through having Evans testify. However, as Mr. Mendes noted in his testimony at the evidentiary hearing, the defense team became convinced that the victim's testimony had been discredited. In addition, given the inherent problems with Evans's testimony, i.e., due to his undeniable involvement in the crime and due to his extensive criminal history, defense counsel altered their strategy and advised Evans to not testify. Evans accepted this advice and elected not to testify.

Appellant's App. at 423-24 (citations to the record omitted).

Here, Evans first contends that his counsel were ineffective "when they failed to pursue an identity defense." Appellant's Br. at 26. Specifically, Evans asserts that his counsel failed to introduce into evidence a photo of the "obscured window," floor plans, a linguistic analysis of the wire recording, and a photo of the color of Neely's pants, which "were not brown, but . . . light blue-green." Id. at 26-32. Evans further asserts that his counsel failed to sufficiently impeach Keedy.

Evans' argument that his counsel "failed to pursue an identity defense" misunderstands his trial counsel's strategy. His counsel's main theory of defense was an identity defense, namely, that either Evans was not the person who strangled Keedy or, at the very least, that the State did not prove beyond a reasonable doubt that he was. Thus, we agree with the State that "what [Evans] really seems to be arguing is that counsel should have presented this defense in a more persuasive manner." Appellee's Br. at 25. To that end, we note that Evans' trial counsel questioned the witnesses regarding their view through the window and the color of Neely's pants; they thoroughly impeached Keedy; and they questioned how well a listener could tell who was who in the wire

10

recording. Counsel can only do so much. We will not nitpick their tactics and strategy. See Mallory, 954 N.E.2d at 936. Evans cannot prevail on this claim.

Evans next asserts that his counsel rendered ineffective assistance when they did not get his out-of-court statements to an officer, that Evans was simply trying to scare Keedy, admitted during that officer's testimony under the excited utterance exception to the hearsay rule. On this issue, the post-conviction court ruled as follows:

> the Court finds that application of the excited utterance rule is highly fact specific and Evans has not produced enough evidence to legitimately evaluate the specific nature and circumstances of the statements. However, regardless of whether a hearsay exception applies, a deeper problem exists because it is likely that the statements would still have been inadmissible, because it has long been the rule that a defendant who does not testify cannot introduce exculpatory statements made outside of court in order to enhance his credibility at trial. See Sweeney v. State, 704 N.E.2d 86, 110-[11] (Ind.[ ]1998).

Appellant's App. at 441-42.

It has long been the law in Indiana that a defendant may not enhance his own credibility by using self-serving, out-of-court hearsay declarations not subject to cross-examination. Brafford v. State, 516 N.E.2d 45, 48 (Ind. 1987) (citing Hernandez v. State, 439 N.E.2d 625, 628-29 (Ind. 1982); Cain v. State, 261 Ind. 41, 300 N.E.2d 89 (1973)). To avoid this rule, Evans attempts to invoke the excited utterance exception to such hearsay prohibitions. The excited utterance exception requires, among other things, a "startling event." Ind. Evidence Rule 803(2). But, in effect, Evans' argument is that he can have his self-serving statements admitted without cross-examination so long as he creates his own startling event, as he did here. He cites no law for that proposition, and his conclusion would undermine the rule discussed in Brafford. And his counsel's

11

strategic decision not to call Evans as a witness in order to have his statement admitted was a wise one. This argument is, therefore, without merit.

Evans' third argument is that his counsel were ineffective when they "allowed false testimony" to be admitted by the State regarding Evans' alleged involvement in the bank fraud scheme with Keedy in Kentucky. Appellant's Br. at 41. As explained by the post-conviction court:

> it is important to note exactly what Evans is claiming, and what he is not claiming. In making this argument, Evans does not claim that trial counsel did not try to get this evidence excluded. In fact counsel filed a Motion in Limine on this point and argued the issue prior to trial. Evans also does not claim that this evidence was improper under Ind. Rule of Evid. 404(b). Evans does not claim that this evidence was used for some improper purpose, or that the State did not have a good faith basis for bringing it forward. Finally, Evans does not claim that the evidence was not carefully limited, because the trial record makes clear that this evidence was admitted for the limited purpose of proving motive, and the jury was instructed on this issue when the evidence was introduced and in the Court's final instructions.

> Instead, Evans narrowly claims that his counsel were ineffective because they did not properly address this 404(b) evidence by introducing evidence [namely, an alibi defense] that he was not involved in the crimes. . . .

> * * *

> In this case, by not emphasizing these extraneous charges, defense counsel clearly made a strategic choice. It is not unreasonable to believe that dwelling on these charges and introducing evidence of an alibi for two dates in Kentucky would have opened the door to the State introducing an endless parade of evidence of other dates in States other than Kentucky. . . .

Appellant's App. at 430-31.

We agree with the post-conviction court's assessment that Evans' counsel made the strategic decision not to dwell on the extraneous bank fraud charges. Indeed, Evans

does not refute the post-conviction court's assessment of his counsel's strategy but, instead, merely reiterates his claim that this decision was prejudicial to him. We are not persuaded by Evans' argument and we defer to his counsel's trial strategy. See Mallory, 954 N.E.2d at 936. Accordingly, Evans cannot show error on this issue.

## No Resulting Prejudice

Evans is correct that prejudice is proven by showing that counsel's errors were so serious as to deprive the defendant of a fair trial. Appellant's Br. at 12. But Evans' remaining three arguments fail to demonstrate a reasonable probability that, but for his counsel's alleged errors, the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. Again, Evans' remaining arguments are that his counsel failed to object to an allegedly defective jury instruction; they failed to investigate the authenticity of the State's audio recording; and they permitted the State to introduce an inaccurate transcript of the State's audio recording.

More specifically, Evans first asserts that his counsel ineffectively permitted the jury to receive an erroneous instruction on accomplice liability on the attempted murder charge. But even if this were an erroneous instruction, as discussed in our opinion on Evans' direct appeal, the State's evidence overwhelmingly showed that Evans was the principal in Keedy's attempted murder. It is, therefore, irrelevant how the jury was instructed with respect to accomplice liability.

Evans also contends that his trial counsel ineffectively failed to investigate the authenticity of the State's audio recording. But the post-conviction court expressly found that "Evans has failed to prove that there were any intentional or unintentional alterations

13

of the recording." Appellant's App. at 440. We are in no position to reconsider the post-conviction court's assessment of Evans' evidence. See Lindsey, 888 N.E.2d at 322 (discussing Hall, 849 N.E.2d at 468-69). Accordingly, in light of Evans' failure to demonstrate any alterations to the audio recording, it is irrelevant whether his counsel investigated the authenticity of the State's recording.

Finally, Evans complains that his counsel allowed the jury to see a transcript of the audio recording that did not accurately reflect the contents of the recording. But during his trial, the court specifically instructed the jury that the transcript was demonstrative only, and that, "if there is a discrepancy in what [you] read in the transcript and what you hear on the tape, . . . the best evidence will be what you hear on the tape." Trial Transcript at 777-78. It is well settled that a court must presume that the jury followed the trial court's instructions. Harris v. State, 824 N.E.2d 432, 440 (Ind. Ct. App. 2005). Thus, Evans cannot show that any discrepancy between the transcript and the audio recording was material to the jury's deliberations. And, as a result, he cannot show that he was prejudiced by his counsel's alleged error.

## Conclusion

In sum, we affirm the post-conviction court's judgment in all respects. Evans' first stated issue is not proper for post-conviction review. And his claims of ineffective counsel are all without merit. The post-conviction court's judgment denying Evans' petition for post-conviction relief is affirmed.

Affirmed.

RILEY, J., and DARDEN, Sr.J., concur.