**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANT:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**THOMAS G. GODFREY**
Anderson, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 48A02-1210-CR-823 |
| | ) | |
| HARLEY PERKINS, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable Dennis D. Carroll, Judge
Cause No. 48C06-1208-FD-1471

**June 28, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

The State appeals the trial court's order granting a mistrial and dismissing the charges against Harley Perkins ("Perkins"), and it raises the following issue: whether the trial court erred when it dismissed the charges against Perkins after granting his motion for mistrial.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On June 21, 2012, Perkins began his placement at the Madison County Work Release Center ("Work Release"), after serving a portion of a misdemeanor sentence at the Madison County Jail. As part of his Work Release placement, he signed a contract, which included a term that he could never be out of the Work Release facility for sixteen hours or more in a twenty-four-hour period. He understood that a failure to return to the Work Release center would constitute a violation of the rules.

On that same date, Correctional Officer Thomas Buckner gave Perkins a two-hour "intake pass," which is permitted to all new residents and allows them to leave the facility and obtain clothing and personal belongings. *Tr.* at 28. Perkins left and never returned to the facility. Later, the State charged Perkins with Class D felony failure to return to lawful detention,[1] and it alleged Perkins was an habitual offender.[2] A jury trial was held in September 2012.

Perkins testified at trial, explaining that upon getting the intake pass, he got a ride from the Work Release facility to the home of his friends Amy Stewart and Jimmy Jones,

---

[1] *See* Ind. Code § 35-44-3-5(c).

[2] *See* Ind. Code § 35-50-2-8.

2

where his fiancée Destiny Dudley ("Dudley") and their infant child were temporarily residing. He visited with Dudley and the baby for forty-five minutes or so, and then he left on his bicycle with plans to go to his father's house. He was riding his bike doing "tricks" through an intersection when he fell over the handlebars and sprained his ankle. *Tr*. at 84. He obtained medical attention for the ankle injury at a hospital. Perkins testified that, while there, he called Work Release at approximately 6:30 p.m. and spoke to Officer "Shuler," who advised Perkins that being late to return is a violation of Work Release rules.

Perkins testified that he realized a rules violation likely meant that he would be required to return to the County Jail to serve an additional six months to a year. Rather than face that possible consequence, Perkins chose not return to Work Release and "spent a [] month out with [his] family." *Id*. at 83. Specifically, he stayed with Dudley and their daughter. During the time he was with them, Dudley underwent gall bladder surgery, and Perkins took care of her and the child. He also testified that he attempted to find suitable housing for Dudley and the child. Dudley testified that Perkins "was going to make an arrangement" to turn himself in to authorities. *Id*. at 74. Similarly, Perkins testified that he was planning to turn himself in and that he had arranged for his family to contact police because he did not have any available minutes on his cell phone to make the phone call.

After learning that Perkins was staying with Stewart and Jones, Elwood Police Detective Scott Bertram and other officers went to that home with a warrant and spoke with Stewart, who reported that she did not know in what room Perkins was located in the house.

3

Detective Bertram prepared to enter the home with a K-9 partner, when Perkins appeared and was arrested without incident.

In rebuttal to the proposition that Perkins had made arrangements to turn himself in, the State called as a witness Detective Bertram, who had located Perkins and served the warrant. Detective Bertram explained that he learned of Perkins's whereabouts by talking with Perkins's father. When he was asked how he came in contact with Perkins's father, Detective Bertram explained that the contact was at the father's home, stating, "We went to his father's house for two reasons. One was to look for Mr. Perkins and two was to look for a methamphetamine lab." *Id*. at 110. Perkins objected, the parties approached the bench, and Perkins moved for a mistrial, which the trial court took under advisement.

The trial continued, and the State then called as a witness Work Release Officer Ryan Sheler, the officer with whom Perkins allegedly had spoken with when he telephoned Work Release from the hospital on June 21, 2012. Officer Sheler stated he was at work that day, but did not take a call from Perkins and had never had a conversation with him.

After the State rested, the trial court held a hearing on Perkins's motion for a mistrial. The trial court found that Detective Bertram's statement about a methamphetamine lab was highly prejudicial because it was suspected at Perkins's father's house, where evidently authorities believed Perkins might be, since that is where they were going to look for him. The prosecutor offered admonitions and suggestions to address any prejudice; however, the trial court determined that there was no way to adequately cure the effect of the statement on

4

the jury. It granted the mistrial at the conclusion of the hearing, and it dismissed the failure to return to lawful detention and habitual offender charges. The State now appeals.

## DISCUSSION AND DECISION

The decision to grant a motion for mistrial lies within the sound discretion of the trial court. *Pavey v. State*, 764 N.E.2d 692, 698 (Ind. Ct. App. 2002) (citing *Palmer v. State,* 486 N.E.2d 477, 483 (Ind. 1985)), *trans. denied.* The trial court's decision is afforded great deference on appeal because the trial court is in the best position to gauge the surrounding circumstances of the event and its impact on the jury. *Id*. (citing *Mack v. State,* 736 N.E.2d 801, 803 (Ind. Ct. App. 2000), *trans. denied*). The declaration of a mistrial is an extreme action which is warranted only when no other recourse could remedy the perilous situation. *Id*. (citing *Palmer,* 486 N.E.2d at 483).

Where, as here, a defendant makes a motion for a mistrial, the defendant forfeits the right to raise any objection to a new trial on the basis of double jeopardy unless the motion is necessitated by governmental conduct that was "intended to 'goad' the defendant into moving for a mistrial." *Willoughby v. State*, 660 N.E.2d 570, 576 (Ind. 1996). As has been stated by our Supreme Court in *Willoughby*:

> To determine whether a second trial is barred after a defendant's motion for a mistrial, we must examine whether the prosecutor brought about the mistrial with the intent to cause termination of the trial. If the State acted with intent to force the defendant into moving for a mistrial, the prohibition against double jeopardy bars a second prosecution.

*Id*.; *see also* Ind. Code § 35-41-4-3 (another prosecution is barred if prosecuting authority acted with intent to cause termination of trial).

Here, the State appeals the trial court's decision to dismiss the criminal charges, and thus preclude a second trial, following its granting of his motion for a mistrial. We review a trial court's decision to dismiss a charging information for an abuse of discretion. *State v. Jones*, 918 N.E.2d 436, 438 (Ind. Ct. App. 2009). We will reverse the trial court only when the decision is clearly against the logic and effect of the facts and circumstances. *Id*. Trial courts "have the inherent authority to dismiss criminal charges where the prosecution of such charges would violate a defendant's constitutional rights." *Id*.

In its appeal, the State argues that it was error for the trial court to dismiss the charges because the State did not intend to force Perkins into moving for a mistrial. However, we conclude that the trial court acted properly. A review of the transcript of the hearing on the motion for mistrial establishes that, while the State may not have introduced the testimony of Detective Bertram specifically so that Perkins would request a mistrial, the State did in fact intend that the testimony come into evidence. That is, there is no indication that Detective Bertram's comment about the methamphetamine lab was an utter surprise, a slip out, or was otherwise unintended. Rather, the record reflects that the State knew when it called Detective Bertram to testify that he was going to testify to the two reasons that the police went to Perkins's father's home, one of which was to investigate a methamphetamine lab. In opposing Perkins's motion for a mistrial, the prosecutor's position was that the statement possessed some probative value, was not overly prejudicial, and any prejudice could be cured by court admonition. Specifically, the prosecutor suggested that the trial court clarify to the jury that the statement concerning a methamphetamine lab concerned Perkins's father only,

6

not Perkins. The trial court, however, was unpersuaded that the prejudice could be cured because the Detective's statement clearly tied defendant to his father, and in turn his father to a meth lab, which the trial court determined was significantly damaging.

We find this case to be distinguishable from *Willoughby*, where the prosecutor questioned a police officer about the officer's investigation of the murder charges and asked the officer where the interview with an accomplice had taken place. 660 N.E.2d at 575. The officer answered that he had gone to the defendant's house to talk with the defendant about taking a polygraph test, and at the mention of a polygraph test, Willoughby moved for a mistrial, which the trial court granted. *Id*. When the charges were thereafter scheduled for a new trial, Willoughby moved to dismiss, asserting double jeopardy violations. The trial court denied the motion and stated that the reference to the polygraph test was inadvertent and not the result of any intentional misconduct on the part of the prosecutor and the officer. *Id*. at 575-76. Following Willoughby's conviction in a second trial, he appealed and argued, among other things, that the second trial after a mistrial constituted double jeopardy. The Indiana Supreme Court affirmed the trial court's decision that the Officer's comment concerning the polygraph test was "not a response that the prosecutor likely anticipated" and a subsequent trial was not thus barred. *Id.* at 576.

In contrast to the reference to the polygraph test in *Willoughby*, the record in the present case indicates that the reference to the meth lab was not inadvertent or a surprise to the prosecutor. Rather, the prosecutor suggested the Detective's statement was proper because Perkins had "opened up" his criminal history and that its probative value outweighed

7

its prejudicial effect. *Tr*. at 116, 120. Although the trial court did not make any express finding as to whether the Detective's comment was intended to goad Perkins into moving for a mistrial, we find that the trial court's comments at the hearing sufficiently reflect its determination that Perkins had no other choice but to move for a mistrial, *i.e.*, he was effectively forced into it. Accordingly, the trial court did not err when it dismissed the charges.

The State also claims that a mistrial was unwarranted. The trial court's decision to grant or deny a motion for a mistrial is within the discretion of the trial court, and its ruling is reviewed solely for an abuse of discretion. *Jackson v. State*, 925 N.E.2d 369, 373 (Ind. 2010). "'We accord great deference to the trial court's decision, as it is in the best position to gauge the circumstances and the probable impact on the jury.'" *Evans v. State*, 855 N.E.2d 378, 387 (Ind. Ct. App. 2006) (quoting *Kirby v. State*, 774 N.E.2d 523, 533-34 (Ind. Ct. App. 2002), *trans. denied*), *trans. denied*. In determining whether a mistrial is warranted, the relevant inquiry is whether the defendant was placed in a position of grave peril to which he should not have been subjected; the gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Id*. (quotations omitted).

As stated above, the trial court determined that the Detective's statement that he went to Perkins's father's house (1) to look for Perkins and (2) to look for a methamphetamine lab was very prejudicial. The court illustrated its position:

> Don't you get how prejudicial it is to say by the way we were also at his house investigating him for child molesting? . . . Or we were also at his house investigating him for operating a meth lab. . . . And I am having a lot of trouble seeing why that would come in to a prosecution for a failure to return

to lawful detention. . . . [T]he jury is going to think oh my goodness. All of this stuff we hear about meth labs and here is a guy who is, he's probably really a very dangerous desperado who is operating a meth lab and all they're able to get him on is failure to return to lawful detention but what he really is is a meth producer.

*Tr.* at 118-19. We agree with the trial court. As Perkins argued, the Detective's statement was "powerful and inflammatory in our present culture because it tied [Perkins] to a meth lab." *Appellee's Br.* at 4. As the trial court observed,

It isn't that we went to his father's house to investigate his father for meth production[;] we went to his father's house to look for Mr. Perkins. . . . And they believed there was meth production going on there where they expected to find Mr. Perkins.

*Tr.* at 123. The trial court considered alternatives to a mistrial, but remained concerned that the jury would not be focused on the evidence relating to failure to return to lawful detention. Ultimately, the trial concluded that none of the suggested admonitions would adequately cure the damaging remark.

The State urges that the probable persuasive effect of the methamphetamine remark on the jury was insignificant considering the other evidence of guilt, including that Perkins had received a two-hour pass, but elected not return to the Work Release facility as the contract required him to do. We recognize the evidence of guilt that already had been presented to the jury by the time of the comment at issue, but keeping in mind that the trial court was in the best position to assess the probable impact on the jury of the Detective's remark about the methamphetamine lab, and based on the record before us, we find that the trial court did not

9

abuse its discretion[3] when it granted Perkins's motion for a mistrial and thereafter dismissed the charges against him.

Affirmed.

VAIDIK, J., and PYLE, J., concur.

---

[3] The State cites to *Oregon v. Kennedy*, 456 N.E.2d 667, 675-79 (1982), for the proposition that when a defendant's motion for mistrial has been granted, the trial court should make a finding of fact concerning whether the prosecutor intended to provoke the defendant into moving for a mistrial, and if a trial court does not make finding of fact on an issue for which findings are ordinarily required, then the trial court's decision is reviewed *de novo*. *Appellant's Reply Br*. at 2-3. Even under a *de novo* review, our conclusion is the same, namely that the trial court did not commit error when it dismissed the pending charges against Perkins.