**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 23 2014, 9:43 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**THOMAS W. VANES**
Office of the Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOANNA LATRICE STOKES, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1404-CR-140 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Samuel L. Cappas, Judge
Cause No. 45G04-1102-FB-17

**December 23, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SHARPNACK, Senior Judge**

## STATEMENT OF THE CASE

Joanna Latrice Stokes appeals from her convictions after a jury trial for two counts of Class B felony neglect of a dependent.[1]  We affirm.

## ISSUES

Stokes presents the following issues for our review:

I.      Whether there is sufficient evidence to support Stokes's convictions of neglect of a dependent, each as a Class B felony.

II.     Whether the trial court committed fundamental error by instructing the jury to evaluate Stokes's conduct under a reasonable parent standard of care.

## FACTS AND PROCEDURAL HISTORY

At noon on January 5, 2011, Stokes took her one-year-old son, K.H., to an appointment with his pediatrician for K.H.'s twelve-month well child visit.  While at the appointment, K.H. was attended to by a medical assistant and the pediatrician, and he received the appropriate immunizations.  Neither the medical assistant nor the pediatrician observed any signs of abuse.  Stokes returned home with K.H. and arrived at the apartment at around 2:30 or 3:00 p.m.

Stokes's fiancé, Michael Lampkin, was at the apartment preparing to go to work when Stokes and K.H. returned home.  Lampkin left the apartment at approximately 3:30 p.m. and clocked into work at 3:56 p.m.  A printout of Lampkin's time card reflects that he clocked out from his job at approximately 10:15 p.m.

At around 5:30 p.m., Stokes woke up from a nap when she heard K.H. fussing in

---

[1] Ind. Code §35-46-1-4 (2007).

2

his bedroom. Upon entering K.H.'s bedroom, Stokes observed that K.H. had a nosebleed and had vomited. Stokes attempted to bottle feed K.H., but he would not eat. Stokes later described K.H.'s behavior as unusual because he was extremely lethargic and kept drifting off. Stokes laid K.H. down to sleep, but returned twice more between then and 8:00 p.m. to find that K.H. had vomited on each occasion.

At approximately 8:00 p.m., Stokes telephoned her mother and described K.H.'s condition. Stokes's mother advised her to take K.H. to the hospital. A friend drove Stokes and K.H. to St. Margaret Mercy Hospital in Hammond, which was approximately a mile from Stokes's apartment. Records at the hospital reflected that K.H. was admitted at St. Margaret's at 8:20 p.m. After explaining K.H.'s symptoms to the triage person in the emergency room, Stokes was told that it would be five or six hours before anyone would be available to examine him. Stokes stayed at St. Margaret's for approximately an hour, but then called another friend and arranged a ride to a different hospital. Stokes's friend drove her and K.H. to Community Hospital in Munster arriving there at approximately 10:00 p.m.

K.H. was attended to and evaluated at Community Hospital. K.H. underwent a CT scan and was placed on anti-seizure medication after it was discovered that K.H. had a subdural hematoma, or bleeding on the brain. While she was at Community Hospital, Stokes told a social worker there that she had picked up K.H. from her ex-husband's care the previous day and noticed K.H. had some injuries. Stokes claimed that K.H.'s injuries were the reason for the visit to the pediatrician. Stokes stated that K.H. had a nosebleed, had been vomiting, and had some unusual marks on his face.

3

Because of the seriousness of his condition, K.H. was transported to the University of Chicago Comer's Children's Hospital. Dr. Kelley Staley, the Associate Director of Child Protective Services of the Child Abuse Pediatric Team at the hospital, received the referral on K.H. and examined him in the ICU upon his arrival. At that time, Stokes offered no explanation for K.H.'s injuries. Dr. Staley ordered another CT scan, an ophthalmology examination to detect signs of trauma, and a skeletal survey. The results of the examinations revealed that K.H. had suffered a bilateral subdural hematoma as well as a subarachnoid hematoma, and the right side of his brain was swollen. K.H. had two bruises on the left side of his face and redness on his left eye. He had two small bruises, approximately the size of a dime, on the right side of his cheek. He also had significant bruises on the inner and outer helixes of his right ear. Despite that Community Hospital had administered anti-seizure medication, K.H. suffered two break-through seizures on January 8, 2011, requiring that the dosage of his anti-seizure medication be adjusted.

Dr. Staley made three diagnoses regarding K.H.'s injuries. The first was bruising on both sides of K.H.'s face, second was a subdural bilateral hematoma, and third, encephalopathy, or an altered level of consciousness and abnormal state. Dr. Staley indicated that the injuries K.H. suffered do not occur from an accidental fall and could not have been self-inflicted. Dr. Staley concluded that K.H. suffered those injuries when his head impacted an object at least once. She testified at trial that the fact that K.H. was suffering from breakthrough seizures while on anti-seizure medication was very concerning. Brain injuries such as the ones from which K.H. suffered are very painful.

Police officers used a key Stokes had given to them to enter her apartment. Police

4

officers were surprised to find Lampkin present at the apartment because Stokes had told them that Lampkin did not live there. Lampkin, who had put the safety chain on the door, refused to take it off to allow the officers to enter. After the officers forced entry into the apartment, they looked around the apartment. They discovered a cup-shaped hole in the drywall next to a closet in K.H.'s bedroom. The hole was four feet eight inches from the floor and measured approximately two and one-half inches in diameter. An evidence technician took a swab of the interior and exterior of the hole, and DNA test results revealed that K.H.'s DNA, along with an unknown individual's DNA, was on the swab.

The State charged Stokes with two counts of neglect of a dependent, each as a Class B felony. At the conclusion of a four-day jury trial the jury found Stokes guilty as charged. The trial court sentenced Stokes to a term of ten years executed on each count to be served concurrently. Stokes now appeals.

DISCUSSION AND DECISION

I. SUFFICIENCY OF THE EVIDENCE

Stokes contends that there is insufficient evidence to support her convictions for two counts of Class B felony neglect of a dependent. Our Supreme Court has set forth the appropriate standard of review as follows:

> When reviewing a claim of insufficient evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of the appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. . . . Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. [T]he evidence is sufficient if an inference may reasonably be drawn from it to support the

5

verdict.

*Erkins v. State*, 13 N.E.3d 400, 406-07 (Ind. 2014) (quoting *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007)) (internal quotations and footnotes omitted).

Stokes was convicted of neglect of a dependent under two separate subsections of Indiana Code section 35-46-1-4 (2007). In order to prove the first of the counts against Stokes, neglect through endangerment, the State was required to prove beyond a reasonable doubt that Stokes, who had the care of K.H. through either a legal obligation or a voluntarily assumed obligation, knowingly or intentionally placed K.H. in a situation that endangered K.H.'s life or health, which resulted in serious bodily injury to K.H. Ind. Code §35-46-1-4(b)(2).

The evidence presented at trial revealed that K.H. suffered a serious head injury, with internal hemorrhaging on both sides of his brain. He also had bruises on his face, redness on his left eye, and significant bruising on the inner and outer helixes of his right ear. Dr. Staley testified that K.H.'s injuries could not have been self-inflicted and were unlikely to have occurred accidentally. K.H. had no sign of injury or symptoms of a brain injury at his routine check-up earlier in the day. K.H.'s DNA was found in the hole in his bedroom wall. By Stokes's own account the only people who had access to K.H. during the time between the visit to the pediatrician and the trip to St. Margaret's were Stokes and Lampkin.

Lampkin admitted during his deposition that he had once thrown a knife into the living room wall after watching a movie depicting violence. He had been previously arrested for assault in 2009, had a conviction for domestic violence against a former

6

girlfriend in 2008, and had a conviction for aggravated vehicular highjacking. Lampkin claimed that the hole in the wall of K.H.'s bedroom was caused when he errantly struck a golf ball while practicing chip shots in the house. K.H.'s father did not approve of Lampkin being entrusted with K.H.'s care. Stokes, who was engaged to Lampkin, was aware of Lampkin's history.

Thus, the evidence supports the theory that Stokes committed the abuse herself, or the theory that she entrusted K.H. to Lampkin's care knowing that he was not supposed to be caring for K.H. and was aware of the abuse he inflicted.

Further, the jury had before it evidence that Stokes was not merely present at the scene of the crime but also had the opportunity to commit the offense. "[M]ere presence at the scene of the crime, with nothing more, is insufficient evidence to sustain a conviction for participation in the crime." *Menefee v. State*, 514 N.E.2d 1057, 1059 (Ind. 1987). "However, presence at the scene in connection with other circumstances tending to show participation in the crime may be sufficient to sustain a conviction." *Id*. In this case, the evidence supporting Stokes's conviction showed that Stokes was awake during the entire time she and Lampkin were in the apartment together after K.H.'s pediatric appointment. This evidence supports either theory advanced by the State; Stokes either inflicted the injuries on K.H. or was aware that Lampkin had done so. Stokes's arguments challenging the reasonableness of the inference reached by the jury amounts to an invitation to reweigh the evidence, which we may not accept. *Erkin*, 13 N.E.3d at 406. There is sufficient evidence to support Stokes's conviction on this count.

In the second count, neglect through delay of medical care, the State was required

to prove beyond a reasonable doubt that Stokes, with a legal obligation or a voluntarily assumed obligation to care for K.H., knowingly or intentionally deprived K.H. of necessary support resulting in serious bodily injury. Ind. Code §35-46-1-4(b)(2). Our standard of review of this issue is the same as stated above.

Stokes either caused the injuries to K.H. or was present and awake when Lampkin caused K.H.'s injuries. If Lampkin caused the injuries, then they were inflicted sometime between 2:30 or 3:00 and 3:30 p.m. Under that scenario, Stokes waited nearly five hours before taking K.H. to the hospital to seek medical attention. Upon taking K.H. to the hospital, Stokes lied about the cause and nature of K.H.'s injuries, thus delaying appropriate treatment and care for her son.

If Stokes caused the injuries, then they could have been inflicted anytime from 2:30 or 3:00 p.m. until 5:30 p.m., when Stokes claimed she first noticed a change in K.H.'s health and behavior. He vomited for the first time at approximately 5:30 p.m. and had done so twice more before arriving at St. Margaret's at approximately 8:00 p.m.

Under either scenario, however, Stokes was aware of the cause and nature of K.H.'s injuries but she delayed seeking appropriate and prompt medical attention for him. When she did seek medical attention for his injuries, she misrepresented the nature and cause of the injuries to medical personnel. Dr. Staley testified that head injuries such as the one K.H. sustained evolve over the course of a few hours, and the symptoms manifest within minutes of the injury. Seizures will often result if prompt medical attention is not sought. K.H. received anti-seizure medications at Community Hospital, but he experienced at least two breakthrough seizures at the hospital in Chicago after the medication had been

8

administered. Dr. Staley further testified that those seizures can cause additional swelling and inflammation in the brain and difficulty breathing.

"A parent is charged with an affirmative duty to care for his or her child." *Lush v. State*, 783 N.E.2d 1191, 1197 (Ind. Ct. App. 2003) (citing *Mallory v. State*, 563 N.E.2d 640, 644 (Ind. Ct. App. 1990)). "Neglect is the want of reasonable care—that is, the omission of such steps as a reasonable parent would take, such as are usually taken in the ordinary experience of mankind. . . ." *Id.* (quoting *White v. State*, 547 N.E.2d 831, 836 (Ind. 1989)). "When there are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, it is reasonable for the jury to infer that the defendant knowingly neglected the dependent." *Id.* (quoting *Mitchell v. State*, 726 N.E.2d 1228, 1240 (Ind. 2000)). In *Lush*, a fifteen-minute delay in obtaining medical care was found sufficient to support that defendant's conviction. Here, the circumstances involve more than the delay in reaching a hospital, but also the delay caused by Stokes's failure to communicate the information necessary for K.H. to receive prompt and appropriate treatment for his injuries. There is sufficient evidence to support the jury's verdict as to this count.

Stokes presents the additional argument that her conviction based on delay of medical care should be reduced to a Class D felony because there is insufficient evidence that any delay resulted in serious bodily injury to K.H. Proof of a serious bodily injury is what elevates what would otherwise be a Class D felony offense to a Class B felony offense. *See* Ind. Code §35-46-1-4. The State presented Dr. Staley's evidence regarding the necessity of early diagnosis and treatment in order to prevent the onset of seizures or

9

the evolution of the severity of seizures. She testified that patients with bleeding in the brain relate how painful those injuries can be. In K.H.'s case, he was too young to verbalize the extent of the pain he experienced, but exhibited behavior indicative of one who is experiencing pain and discomfort. The State presented sufficient evidence to support the Class B felony conviction here.

## II. INSTRUCTIONAL ERROR

Although Stokes did not object to Instruction Number 4 at trial, on appeal, Stokes contends that the trial court committed fundamental error by instructing the jury to evaluate Stokes's conduct under a reasonable parent standard of care. Instructing a jury is left to the sound discretion of the trial court, and we review its decision only for an abuse of discretion. *Springer v. State*, 798 N.E.2d 431, 433 (Ind. 2003). On review, we evaluate a trial court's decision to give or refuse a tendered jury instruction in three steps: (1) we determine whether the tendered instruction correctly states the law; (2) we next determine whether the evidence supports giving the instruction; and (3) we determine whether the substance of the instruction was covered by other instructions. *Id*. "We consider jury instructions as a whole and in reference to each other and do not reverse the trial court . . . unless the instructions as a whole mislead the jury as to the law in the case." *Lyles v. State*, 834 N.E.2d 1035, 1048 (Ind. Ct. App. 2005), *trans. denied*.

Failure to object to an instruction at trial typically results in waiver of the issue on appeal. *Brown v. State*, 691 N.E.2d 438, 444 (Ind. 1998). If an instruction is so flawed that it constitutes fundamental error, however, waiver does not preclude review on appeal. *Id*. To qualify as fundamental, an error must be so prejudicial to the rights of the defendant

as to make a fair trial impossible. *Id.* Fundamental error is a substantial, blatant violation of due process. *Taylor v. State*, 717 N.E.2d 90, 93 (Ind. 1999).

The instruction given by the trial court reads as follows:

> A parent is charged with an affirmative duty to care for her child and the standard of care is what a reasonable parent would do or not do under the circumstances.

App. p. 115. Stokes contends that the trial court's decision to give the instruction amounts to fundamental error because the jury was misled regarding the appropriate *mens rea* for the offense. More particularly, Stokes claims that the jury was invited to convict her of the offense by applying a lesser negligence standard of care rather than by applying the knowingly or intentionally *mens rea* required for a criminal conviction.

Instruction Number 4 was based on language used in *Mallory v. State*, 563 N.E.2d 640, 644 (Ind. Ct. App. 1990), a case in which the defendant was charged with knowingly depriving her child of necessary support. That language has not been expressly approved for use in instructions. The challenged instruction, standing alone, would not be sufficient to inform the jury of the *mens rea*. However, in the present case, the jury was otherwise instructed with respect to both counts that the *mens rea* for the offenses was knowingly or intentionally. App. pp. 111-14. Taking the instructions as a whole we cannot conclude that the jury was misled such that fundamental error occurred.

CONCLUSION

In light of the above, we affirm the trial court's decision.

Affirmed.

NAJAM, J., and CRONE, J., concur.

11